(No. 45925.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. STEVEN ARTHUR CAMEL, Appellant.

*Opinion filed Sept. 27, 1974.—Rehearing denied Nov. 26, 1974.*

Robert I. Auler, of Champaign (Robert W. Dodd (Senior Law Student), of counsel), for appellant.

William J. Scott, Attorney General, of Springfield, and Lawrence E. Johnson, State's Attorney, of Urbana (James B. Zagel and Charles H. Levad, Assistant Attorneys General, Thomas L. Knight, Assistant State's Attorney, and Harry C. Bulkeley (Senior Law Student), of counsel), for the People.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

Following a bench trial in the circuit court of Champaign County in March 1971, defendant, Steven Arthur Camel, was convicted of rape and aggravated kidnapping. He was sentenced to concurrent terms of 10 to 25 years in the penitentiary. His convictions were affirmed by the appellate court (*People v. Camel*, 10 Ill. App. 3d 1022), and we granted leave to appeal. Defendant asserts that numerous errors occurred during the preliminary hearing and in the trial.

On March 17, 1970, following her usual custom, the 16-year-old victim of these crimes, left her home about 8 a.m. to walk to the home of a girl friend with whom she would then walk to high school in Champaign. While on the way, a man walking in the same direction passed her, stopped, turned around a few feet away from her and asked the location of the university. The victim pointed in

the general direction. The man had a scarf wrapped around his head covering the lower portion of his face up to about the middle of his nose. He was not wearing a hat.

Following this encounter the victim crossed the street to avoid further contact, but the assailant also crossed the street and blocked her path. He again asked the location of the university, to which she briefly replied that he had a long way to go. The assailant, who had both hands in his pockets, told her that he had a gun and wanted all her money. She attempted to comply but he ordered her to come with him instead.

When they began walking, he placed a knife at her back, then told her to keep her head down as they approached a four-door car that she described as "greenish-bluish" in color. After she got in the passenger side of the car, he ordered her to keep her head down close to her knees and he blindfolded her. When she began to cry, he told her to "shut-up" and he put a knife to her throat. He started driving for a few minutes and then he stopped to tie the girl's hands behind her back. He threatened her with the knife when she again started to cry. The assailant resumed driving and ordered the victim to take off her underpants. When she responded that she could not because her hands were tied behind her back, he stopped the car and removed them. He then continued driving and told the victim to climb in the back seat. Several minutes later he stopped the car, climbed into the rear seat and raped her.

The assailant released the victim at a park in Champaign after telling her to face the opposite direction of the car and not to look back until he was gone. She then ran to her school where she made an immediate complaint to the dean of girls. Her parents arrived, and they took her to the family doctor for treatment.

Later that morning the victim talked to the Champaign police and gave a statement describing her attacker as between 21 and 22 years old, around 5 feet 8 inches

tall, with a small build, dark brown hair combed over his forehead and hanging down around his ears, small hazel eyes, medium voice, and wearing a hip-length brown corduroy jacket. The same day she also viewed some suspects at the police station by means of closed-circuit television and did not identify any of them. Some days after the attack, she viewed numerous photographs and again did not identify her assailant's picture as being among them.

Defendant was taken into custody for an unrelated matter on March 30, 1970. Though he had not yet been identified by the victim as the attacker, a preliminary hearing was held May 28, 1970, on these charges of rape and kidnapping in addition to other criminal charges. The victim and her father were present and she made a positive identification of defendant as her assailant at this time. Defense counsel did not appear, although the record and the defendant's brief filed in this appeal indicate that counsel was aware that the proceeding would occur on this date.

Prior to trial a hearing was had on a motion to suppress this identification and the motion was denied. Defendant's girl friend, Victoria Booth, who later married defendant, had attended the preliminary hearing, and she testified that there were no other persons present on other cases, nor were other accuseds at the proceeding. She stated that defendant was the only Caucasian brought before the bench during the hearing which lasted 30 to 45 minutes. She testified in an offer of proof that defendant informed the court his attorney was not present and he wanted a continuance which the court denied. She further indicated that the victim and her father were in court, that prior to the hearing they conversed together, and both spoke with an assistant State's Attorney. The trial court refused to allow an offer of proof as to the conversation between the victim and her father. An offer of proof, however, was permitted as to the conversation with the

assistant State's Attorney. The witness Booth asserted that the father asked if his daughter would have to testify and the assistant State's Attorney responded that she was just to watch.

Defendant called the victim to testify at the suppression hearing. She stated that she had attended the preliminary hearing in order to familiarize herself with court procedure, and that she was unaware that defendant would be present. In describing the several matters heard that day, she testified that two or three cases were called before defendant's. She asserted that she identified one of the men talking to the judge as her assailant, and did so prior to knowing the reason for his presence. She identified defendant by viewing him from the back and by hearing his voice. She stated that her father, not she, had spoken with the assistant State's Attorney, and that she did not hear what was said. When questioned by defense counsel on redirect if the man she identified was the same man she had seen in a photograph, she replied that he was not. When defense counsel attempted to question her further as to previous photographs she had viewed, the court ruled that it was improper redirect examination and refused an offer of proof.

The victim's father testified that they attended the preliminary hearing to find out whether it would be possible for his daughter to identify her assailant, or whether the police should keep looking for him. He stated he knew defendant would be present in court and there would be a preliminary hearing, but denied he knew it was for defendant, or if he was even sure he knew defendant's name. He was uncertain concerning when defendant's case was called that day. He said, however, his daughter had identified defendant prior to any testimony related to the present offenses and it was subsequent thereto they first realized defendant was there in regard to his daughter's case. He denied speaking with the assistant State's Attorney.

At trial the victim identified the defendant as her assailant. She admitted viewing a closed-circuit television display the day of the attack, and looking at numerous pictures, though she could not remember when the latter occurred. She could not recall seeing a picture of defendant at the photographic display.

Joyce Parkhill and her son Bill, then age 13, were witnesses for the prosecution. Around 8 a.m. on March 17, 1970, they were driving to school when they saw a car stopped at an intersection in front of them, and as they pulled alongside of the car they saw a young man in the driver's seat with a scarf wrapped around the lower half of his face. Joyce Parkhill, a free-lance artist, described the facial characteristics of the man, and said that his hair was shoulder length. She testified at trial that the defendant had the same facial characteristics as the man she had seen. She was unable, however, to positively identify the defendant, who was shown in one of five photographs she was asked to examine approximately one year after the incident and one and one-half weeks before trial. She did describe the car driven by the man as "turquoise" or "aqua, blue-green" in color.

Bill Parkhill testified that he saw the man sitting in the car, and a girl slouched down in the passenger seat who was wearing a hat which looked like the one worn by the victim. He described the car as "turquoise" in color. At the photographic identification this witness selected a photograph of defendant as his second choice out of five photographs. During trial he identified defendant as the man he saw in the car, though he admitted he was not completely certain.

During the photographic identification, the Parkhills were shown a series of photographs of automobiles, including a four-door, "forest-green" car owned by Victoria Booth. Joyce Parkhill preferred not to attempt an identification of the vehicle. Her son identified one other than that owned by Victoria Booth.

Dr. Kelso, the family physician since 1955, testified as a treating physician. He stated, over defense objection, that the girl related to him that she had been raped. He further testified that vaginal smears taken from the girl and tested by an independent laboratory indicated the presence of sperm.

Victoria Booth testified as an alibi witness. She stated that defendant spent the night of March 16, 1970, at her apartment and that he did not leave the next morning until about 8:30 a.m. when he walked toward the university. Defendant did not use her automobile, though he had on occasion driven it. She testified that defendant's hair length was just a little over his ears at the time. She and other defense witnesses established that the defendant's eyes were brown. Moreover, she said that defendant's right arm, which had previously been broken, was in a half cast and fixed in a 90 degree position from the elbow. When defendant left her apartment on the day the offenses occurred, she claimed the cast protruded out of the bottom of the jacket sleeve and it was held in place with gauze and bandages. She stated that on March 23, 1970, pursuant to doctor's instructions, she and defendant cut away the bandages to remove the cast so that defendant could attempt to exercise the arm as directed. Following this exercise, the cast was replaced and held with an elastic bandage so that it could easily be removed for subsequent exercises. She asserted that the uncasted arm remained in the 90 degree position and that defendant was unable to use the arm for the most minor activity, and any utilization often caused pain. She admitted, however, on cross-examination that she and defendant had intercourse during the period his arm was in the cast.

While she attended the defendant's preliminary hearing and other proceedings, she explained that she did not inform the court or the police that defendant was at her apartment until 8:30 a.m. on the morning of the attack. She claimed that she was unaware of the time the rape had

occurred until she spoke to defendant's attorney.

An agreement was entered into by the parties with regard to the testimony of a doctor who had examined defendant one month after the attack. It was stipulated he would testify that at this examination defendant wore a cast covering the bottom inner portion of the right forearm and it was held in place by an elastic wrapping. The diagnosis indicated an un-united fracture of the radius of long-standing duration. From subjective statements made by defendant and visual observation, the doctor concluded that the arm was fixed in a 90-degree position, though he did not physically manipulate the arm to determine if it could be moved. He did not expect that use or physical contact with the arm would cause pain, but that vigorous activity might.

Two rebuttal witnesses were called by the State, one, a classmate of defendant, and the other, the manager of the shoe store where defendant was a part-time employee. They testified that defendant was able to use his right arm, despite the cast, without exhibiting any discomfort, and that he wore a new cast held by an elastic bandage prior to March 17, 1970. Moreover, the store manager testified that he saw defendant fully extend his injured arm, though he could not remember the exact date this occurred.

Defendant raises numerous contentions in regard to the trial court proceedings. He argues that the victim's identification was improperly admitted, thereby denying his right to due process of law. He maintains that the identification at the preliminary hearing was an unnecessarily suggestive and planned encounter. In *People v. Blumenshine,* 42 Ill.2d 508, 511, it was stated "*** 'that *Stovall* [*Stovall v. Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967] requires that a defendant so claiming must prove that "the confrontation conducted *** was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." ' " (See also *People v. Dailey,* 51 Ill.2d

239, 243.) *Blumenshine* involved a show-up of the accused in a room with a one-way mirror, and later in the company of a suspected accomplice. This occurred in the presence of the witnesses to the robbery of which he was accused as well as witnesses to other crimes he was suspected of committing.

The situation in the present case is clearly distinguishable from *Blumenshine* and the other cases cited by defendant in support of his position. Here, the victim attended the preliminary hearing on her father's pretense. The record indicates that her father knew the possible assailant would be present, but not that a preliminary hearing was scheduled for him. The victim was there for the purpose of identifying the defendant if she could, but she was not aware of this. She was able to identify the defendant from a back view and by hearing his voice before she even knew the reason for his presence. Her father corroborated the fact that she so identified defendant before any testimony was given pertaining to the present matter. While another identification procedure might have been better, thereby negating defendant's contention, we find that under the facts presented the defendant has failed to establish that the confrontation at the time the identification was made was unnecessarily suggestive. See generally *People v. Catlett*, 48 Ill.2d 56, 61; *People v. Martin*, 47 Ill.2d 331, 338.

Moreover, we find that even if the confrontation at the preliminary hearing was suggestive, under the "totality of circumstances" it was not conducive to a substantial likelihood of mistaken identification. This test, first enunciated in *Stovall v. Denno*, 388 U.S. 293, 302, 18 L. Ed. 2d 1199, 1206, 87 S. Ct. 1967, was restated in *Neil v. Biggers*, 409 U.S. 188, 199, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, where the United States Supreme Court stated that "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the

criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation" were factors to be considered in evaluating the reliability of the pretrial identification conducted under possibly suggestive circumstances.

In the present case the victim observed her attacker from the back in good light as he walked past her and twice from the front when he stood a few feet away. The degree of her attention was obviously high, for, as she testified, she crossed the street in order to avoid talking to him. However, the defendant crossed after her and again stood in front of her. The victim's description of her attacker, given shortly after the crimes were committed, included his age, height, build, hair color, eye color, voice and clothing. The only apparent discrepancy urged by defendant between the victim's description of the assailant and defendant was the color of eyes, since evidence was presented that defendant's eyes are brown while the victim described her attacker's eyes as hazel in color. We note, however, that the definition of the color "hazel" covers a spectrum of "light brown to strong yellowish brown." (Webster's Third New International Dictionary 1041 (1961).) While the attacker attempted to disguise his appearance, it was only the lower part of his face which was masked. Thus, there was adequate opportunity to view the attacker in all other physical characteristics. He spoke numerous times throughout the period he held the victim, which provided a basis for the voice identification at the preliminary hearing. We also note that the victim did not identify any other party as her assailant during the time she viewed closed-circuit television pictures of those in police custody or when she was shown photographs by the police.

Defendant next argues that he was denied his sixth amendment right to the assistance of counsel at critical stages of the proceeding, *i.e.,* the preliminary hearing and

the "concurrent lineup" at which the victim identified him. Defendant was represented by counsel from the time of his arrest some two months prior to the preliminary hearing. Defendant's counsel was present at all proceedings prior to the preliminary hearing, but he failed to appear on the date of the hearing. Defendant cites *United States v. Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, and *Gilbert v. California,* 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951, which recognized the right to counsel at a " 'critical stage of the prosecution' " (*Simmons v. United States,* 390 U.S. 377, 382-383, 19 L. Ed. 2d 1247, 1252, 88 S. Ct. 967). Defendant further relies upon *Coleman v. Alabama,* 399 U.S. 1, 26 L. Ed. 2d 387, 90 S. Ct. 1999, which held that a preliminary hearing was a critical stage of criminal proceedings entitling an accused to the benefit of counsel. He further maintains that since the decision in *Coleman* was rendered less than one month after his preliminary hearing and he made a motion to dismiss on these grounds before trial, there would have been no hardship placed upon the State to afford him a proper preliminary hearing.

At the time defendant was identified we had interpreted *Wade* and *Gilbert* as not applying to preindictment lineups. (*People v. Palmer,* 41 Ill.2d 571, 572.) It was not until three years later, in *People v. Burbank,* 53 Ill.2d 261, 272, which followed the United States Supreme Court decision in *Kirby v. Illinois,* 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877, that we modified and broadened *Palmer* to apply the *Wade* and *Gilbert* rule not only to post-indictment lineups but also to lineups conducted after the initiation of any adversary judicial criminal proceedings against an accused. Moreover, the record shows that defense counsel failed to appear at the scheduled hearing, and there is no indication that the State was advised that he would not be there. Defendant's failure to have counsel present was due solely to his attorney's inadvertence.

We further reject defendant's assertion pertaining to

absence of counsel at the preliminary hearing conducted on May 28, 1970. *Adams v. Illinois,* 405 U.S. 278, 280, 31 L. Ed. 2d 202, 206, 92 S. Ct. 916, held that *Coleman* should not be retroactively applied to preliminary hearings conducted prior to the date of the *Coleman* decision (June 22, 1970). At the time the defendant was afforded a preliminary hearing, there was no constitutional recognition of an accused's right to counsel at such proceeding. Thus, it cannot be said that reversible error was committed by conducting the hearing in the absence of defendant's counsel.

Defendant also argues that he should have been afforded a new preliminary hearing pursuant to his timely motion to this effect. However, defendant's "timely" motion was made eight months after the indictment and only about a month before his trial was scheduled to commence. To grant such motions under circumstances such as these would, at the very least, disrupt current criminal calendars while the hearing was conducted. In *Adams v. Illinois,* 405 U.S. 278, 284, 31 L. Ed. 2d 202, 209, 92 S. Ct. 916, the court specifically noted such adverse effects this procedure would cause upon the administration of criminal law.

Defendant additionally charges error in the denial of his right to have counsel present at a photographic identification procedure attended by the Parkhills while he was in custody. This contention has been definitively resolved adversely to defendant in *United States v. Ash,* 413 U.S. 300, 321, 37 L. Ed. 2d 619, 633, 93 S. Ct. 2568, which held that there is no constitutional right to have counsel present at a photographic display not attended by the accused.

Defendant alleges error in the denial of his discovery motion of certain evidence, which he maintains prejudiced the preparation and conduct of his defense. Defendant's pretrial discovery motion included the request, among others, for the production of the preliminary-hearing

transcript, any notes or records as to the preliminary hearing, and for any exculpatory information resulting from the failure to identify the defendant by individuals to whom he was exhibited. He specifically requested the photographs of suspects and vehicles shown to the Parkhills. While he did not receive the photographs for purposes of cross-examination of Joyce Parkhill, he did receive the photographs of suspects, previously viewed by her son, during his cross-examination.

The trial judge granted production of the preliminary-hearing transcript only if one existed. Defendant did not establish that a court reporter was present at the preliminary hearing to record the proceeding. The defendant was supplied with information concerning the identification made at the preliminary hearing, and he has failed to demonstrate that there existed any notes or recorded recollections of the testimony given at the hearing. (*Cf. People v. Durso,* 40 Ill.2d 242.) Furthermore, there is no indication that the State withheld any evidence favorable to him.

Defendant's claim of reversible error in the State's failure to produce the photographs of the suspects and automobiles viewed by the Parkhills is without merit. Neither of the Parkhills made a positive identification of defendant, nor did they identify Victoria Booth's automobile from the photographs shown.

It is claimed that the failure to produce the photographs viewed by the victim and information concerning the viewing of suspects on closed-circuit television was error because had the victim failed to identify defendant this would have detracted from her credibility. Defendant cannot seriously argue this contention as regards the viewing on closed-circuit television. Defendant admits in his brief that the television viewing was conducted the day of the attack, two weeks prior to his arrest, and he has made no claim that he was even present at this occasion. Similarly, defendant has failed to establish the possibility

that his picture was in the possession of the police at the time the victim viewed the photographs. Contrary to defendant's brief, which states that the victim testified that she viewed these photographs more than one month after the attack, at which time defendant would have been in custody, the record reflects that the victim could not remember when she viewed the photographs. In effect, the defendant's request at trial was premised on the bare allegation that his picture was among those exhibited to the victim. Moreover, even if his picture was among the group the victim saw, we do not believe that reversible error occurred. Considering the factors that the victim did not identify anyone from these pictures and that her identification at the preliminary hearing was based upon viewing defendant from the back and upon hearing his voice, the value of the pictures to attack her credibility was slight.

Defendant urges that error occurred in the trial court's denial of certain offers of proof made during the hearing on a motion to suppress. The first offer was permitted in part. Defendant stated that this offer went to the suggestiveness of his identification at the preliminary hearing. It consisted of testimony by Victoria Booth as to what occurred at the hearing. The trial court prohibited the offer when the testimony proceeded to impeach the record by referring to the actual conduct of the hearing not recorded in the record. The testimony, however, dealt not with the suggestiveness of the identification, but rather with defendant's lack of counsel. As we previously held, at the time of this preliminary hearing the right to counsel was not recognized. Consequently, the denial of an offer of proof going to the absence of counsel cannot be reversible error.

The second offer sought to introduce, again through the testimony of Victoria Booth, an alleged discussion between the victim and her father prior to the preliminary hearing. There is no indication in the record or the briefs

filed in this appeal as to the substance of her testimony in this regard. But, even assuming that her testimony might have been supportive of defendant's contention that the identification at the preliminary hearing was conducted under suggestive circumstances, we have previously concluded that under the totality of the circumstances there did not exist the substantial likelihood of misidentification.

The third offer of proof involved an attempt to further question the victim as to the photographs she viewed prior to the preliminary hearing. The defendant had called the victim as a witness at the suppression hearing and then attempted on redirect examination to question her on this matter. Though he was prohibited from making this offer at the suppression hearing, he was able to thoroughly cross-examine the victim during trial as to the photographic display. The contention, therefore, is without merit.

Defendant's fourth offer of proof sought to introduce his own testimony in order to correct the docket as to what took place regarding the admonition of his rights at the preliminary hearing. This offer was made in conjunction with a motion to correct the docket and was supported by affidavits of defendant and Victoria Booth. As illustrated by this written motion, the offer was made primarily for the purpose of establishing that defendant was not represented by counsel at the preliminary hearing and had requested a continuance so that his attorney could appear. Defendant also claimed that he sought to have the preliminary-hearing proceedings recorded, to cross-examine witnesses and to argue certain unspecified matters. The record merely indicates that a preliminary hearing was held, that defendant was present, that testimony was given and that probable cause was found to bind defendant over to the grand jury. The date for the hearing had been scheduled prior thereto with the acquiescence of defendant's counsel, whose absence was later explained as

being due to his presence at "another hearing." Since no right to counsel was recognized at this proceeding, the denial of this offer related to the presence of his counsel was not error. Additionally, it should be noted that at the time the preliminary hearing was conducted there was neither a constitutional right to such a proceeding nor had the constitutional guarantee permitting an accused to confront witnesses against him been extended to encompass such a hearing. (*People v. Petruso,* 35 Ill.2d 578, 580.) A preliminary hearing was designed merely to establish the existence of probable cause that the accused had committed an offense. (*People v. Adams,* 46 Ill.2d 200, 205.) An accused was not required to assert a defense and the proceeding could be terminated when there was the requisite finding of probable cause. (*People v. Bonner,* 37 Ill.2d 553, 560.) Defendant also has failed to cite any authority mandating the recordation of the preliminary hearing proceedings (see *Adams v. Illinois,* 405 U.S. 278, 284, 31 L. Ed. 2d 202, 209, 92 S. Ct. 916), nor does he now advance any contention specifically related thereto. The denial of this offer of proof does not constitute reversible error.

Defendant maintains that error was committed by the admission of the testimony of Doctor Kelso relating to the statement made to him by the victim that she had been raped and to the vaginal smear tests made by an independent laboratory which had not been properly authenticated at trial. The testimony of Dr. Kelso relating to the victim's complaint that she had been raped was properly admissible under our decision in *People v. Gant,* 58 Ill.2d 178. We need not consider defendant's contention relating to the physician's explanation of the laboratory tests, since the record discloses adequate evidence to support the crime of rape.

Defendant argues that he was not proved guilty beyond a reasonable doubt. He directs our attention particularly to evidence concerning his arm cast and the

inferences to be drawn therefrom. The question as to the existence or nonexistence of a cast on defendant's arm, whether it was removable or not removable, and the ability or inability to use the arm was properly for the trier of fact based upon the credibility of the witnesses. We do not find the evidence on this question so unsatisfactory as to raise a reasonable doubt of defendant's guilt and require a reversal of the trial court's determination. *People v. Curry,* 56 Ill.2d 162, 174; *People v. Clay,* 55 Ill.2d 501, 507.

For these reasons, the judgment of the appellate court is affirmed.

*Judgment affirmed.*