COMMONWEALTH *vs.* WILLIE BARNETT.

Suffolk.   December 2, 1975. — September 15, 1976.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, & WILKINS, JJ.

*Identification.   Practice, Criminal,* Disclosure of evidence before grand
jury, Mistrial.   *Evidence,* On cross-examination.

At a criminal trial, there was no error in the admission of an out-of-
court identification of the defendant by a witness which occurred at
a hospital where both were undergoing treatment for gunshot
wounds less than an hour after the commission of the crime. [91-94]
In a criminal case tried prior to the decision in *Commonwealth* v.
*Stewart,* 365 Mass. 99 (1974), this court did not consider whether
the judge abused his discretion in refusing to allow the defendant
to examine a witness's grand jury testimony after the appearance of
a possible inconsistency where, upon a reading of the grand jury
minutes, nothing appeared which bore on the inconsistency or was
otherwise of use to the defendant. [94]
At a criminal trial, the refusal of the judge to allow the defense coun-
sel to make an offer of proof after excluding a question on cross-
examination did not constitute reversible error. [94-95]
At a criminal trial where a police officer stated that the defendant was
identified at a hospital by the victims but identification by only one
of the victims was offered at trial, the judge, who granted a motion
to strike and instructed the jury to disregard the statement, did not
abuse his discretion in refusing to grant a mistrial. [96]

INDICTMENTS found and returned in the Superior Court
on November 2, 1971.

The cases were tried before *Roy, J.*

After review was sought in the Appeals Court, the Su-
preme Judicial Court, on its own initiative, ordered direct
appellate review.

*David S. Mortensen* for the defendant.

*William J. Doyle,* Assistant District Attorney, for the
Commonwealth.

KAPLAN, J.   Willie Barnett was convicted after trial by
jury of assault with intent to rob while armed with a dan-
gerous weapon (G. L. c. 265, § 18) and of three counts of

assault and battery by means of a dangerous weapon (G. L. c. 265, § 15A). He was sentenced to concurrent terms of five to seven years, to be served at the Massachusetts Correctional Institution at Walpole, from and after a sentence remaining to be served in the State of Alabama. An appeal under G. L. c. 278, §§ 33A-33G, is here, having been transferred from the Appeals Court under G. L. c. 211A, § 10(A).

The jury may be taken to have viewed the facts thus. On September 3, 1971, the defendant and two accomplices (both initially assumed by witnesses to be men) entered the Buy Rite Store, a grocery at 1627 Washington Street in the South End of Boston, with intent to rob it. As the defendant came through the front door and drew a shotgun from a paper bag, Clinton Tennyson, a uniformed security guard standing about ten feet away, saw the defendant and the gun although there were several customers in the intervening space. Tennyson ran down an aisle toward the rear of the store. The defendant shot and wounded the store manager, Byron Randall, who was standing behind a cash register, and then ran out the door, apparently without getting at the money. Meanwhile Tennyson moved down the other aisle toward the front of the store while drawing his .38 caliber revolver from his holster. The defendant came back through the door. The two exchanged shots. Tennyson and Mrs. Elizabeth Ware, a customer, were wounded by the shotgun blast (Tennyson receiving shot in his abdomen, face, and right arm), but, as later appeared, neither was seriously injured. The robbers fled.

Police arrived promptly and took Tennyson, Randall, and Mrs. Ware to Boston City Hospital. As one of the police units that had transported the wounded was returning to its station, the officers observed the defendant and another seated on the fender of a car in the parking area of a nearby garage at Shawmut Avenue and Ruggles Street. These two matched the rather general descriptions of two of the robbers that the officers had obtained at the scene and evidently over the police radio; and (according to testimony received at voir dire but not at trial) adjacent to the two was a red Ford Falcon automobile with

a Connecticut license plate No. JS2939 matching a description, received over the radio, of a red automobile with Connecticut license plates believed to have been the car in which the robbers made their escape down Shawmut Avenue after the robbery attempt. Stopping at the garage, the officers saw that the defendant was bleeding from a gunshot wound in his left shoulder. As it turned out, the other person was a woman with close-cropped hair dressed in man's clothing. The officers took the two to Boston City Hospital. The defendant was hysterical and nauseated during the short drive.

As the defendant lay on a litter in an X-ray room with gauze visible covering his wound, Tennyson was wheeled into the room, also on a litter, and he immediately and positively identified the defendant as the man who had shot him.[1] The confrontation occurred within an hour of the robbery. At the trial Tennyson also identified the defendant as the gunman.

When the doctors later extracted the slug lodged in the defendant's shoulder, it proved to be of .22 caliber and not capable of being fired from Tennyson's revolver. There was no testimony of any gunplay at the store besides that between Tennyson and the defendant, but a discharge from a .22 caliber weapon was not excluded.[2]

---

[1] In an affidavit filed in support of a motion to inspect grand jury minutes, the defendant indicated that Byron Randall had also identified him at the hospital as the gunman. The Commonwealth stated during voir dire that Randall could not be located and would not appear as a witness for the prosecution.

[2] Tennyson said that he and the defendant exchanged simultaneous shots. Yet Mrs. Ware testified that after she heard a loud noise at the front of the store (presumably the shooting of Randall), Tennyson ran past her and she then heard "bang-bang" — distinct shots. It is possible that the second bang was the firing of a .22 caliber weapon. Or perhaps the witnesses at the store did not hear the report of a .22 caliber weapon in the confusion and in comparison with the louder discharge of the shotgun and the .38.

As the defendant drew the shotgun from the paper bag, one of his companions was near Tennyson and the other was standing by the cash register. The record does not make clear how the two escaped from the store.

The strength of Tennyson's identification was enhanced by his testimony that he had seen the defendant at the store three or four times in the month preceding the robbery; he had particular reason to recognize him during the robbery because on a visit to the store earlier that week the defendant had called him "Uncle Tom's old nigger."[3] On the other hand, the probative force of the fact that the slug in the defendant's shoulder could not have come from Tennyson's revolver was no doubt minimized by the jury because the defendant wavered badly on how the wound came to be inflicted. When the officers spoke to the defendant at the garage and subsequently at the hospital, he claimed he was robbed of $75 at a fruit stand across the street from the garage and had been shot during a struggle with the robbers. Early the next day he told the police that he shot himself accidentally during an argument and scuffle with his wife. At trial his story mediated between the two versions. He said he left the garage in midafternoon and was robbed (but not shot) at the fruit stand; he did not return to his companions at the garage but continued to his sister's apartment several blocks away where he was living with his wife; disgusted at the loss of his money, he attempted suicide with his sister's revolver, but succeeded only in wounding himself in the shoulder; he then returned to the garage on foot and was apprehended by the police.[4]

---

[3] At the probable cause hearing Tennyson said a fellow with the defendant at the previous visit called him "Honky Tonk." This left the possibility that Tennyson, who was a somewhat inarticulate witness, meant that the defendant called him "Uncle Tom's old nigger" and the companion called him "Honky Tonk," but on voir dire and at trial Tennyson appeared to deny that the companion made the statement.

[4] The defendant testified that he was employed at the garage but was not working on the day of the robbery. His story at trial was partially, but lamely, confirmed by a mechanic at the garage who testified for the defense. Both asserted that the police arrived and apprehended the defendant some time before 4 P.M., which was before the robbery occurred. There were certain mutual inconsistencies in their accounts of why the defendant was waiting at the garage instead of going to the hospital for treatment of his wound.

On this appeal, the defendant argues that the judge committed error in declining on the defendant's motion (1) to suppress the out-of-court and in-court identifications by Tennyson; (2) to allow the defendant to examine testimony before the grand jury; (3) to permit the defendant to make certain offers of proof; (4) to grant a mistrial. Error is also claimed (5) in the judge's failure to halt the prosecution's pursuing a certain line of cross-examination.

1. The defendant moved in advance of trial to suppress evidence of identifications of him, both in- and out-of-court, by the eyewitness Tennyson.[5] Following the method and standards derived from the *Wade-Gilbert-Stovall* cases,[6] the judge received evidence at an extended voir dire regarding the circumstances of the hospital identification which paralleled the evidence on the subject at trial summarized above. The judge found the confrontation at the hospital to be permissible; accordingly he ruled that the testimony as to that identification could be admitted at trial, and as there was "no poison" in the hospital confrontation, there was no need to show that an in-court identification would be based on an independent untainted source. Paying due regard to the judge's appraisal of the testimony, we find no basis for rejecting his conclusion.

A "one-on-one" confrontation with a person in custody

---

[5] This motion was made originally on the theory that the identification at the hospital should be suppressed because of the absence of counsel. After the filing of the motion the Supreme Court held in *Kirby* v. *Illinois*, 406 U.S. 682 (1972), against a right to counsel at preindictment identifications. At the outset of the voir dire the defendant shifted theories; he contended that the confrontation was impermissibly suggestive, denying the defendant due process of law.

[6] *United States* v. *Wade*, 388 U.S. 218 (1967). *Gilbert* v. *California*, 388 U.S. 263 (1967). *Stovall* v. *Denno*, 388 U.S. 293 (1967). See the discussion of the effect of these cases in *Commonwealth* v. *Botelho*, 369 Mass. 860, 865-868 (1976). We noted in *Botelho* the possibility that *Neil* v. *Biggers*, 409 U.S. 188 (1972), might presage a different approach by the Supreme Court. The recent grant of certiorari (425 U.S. 957 [1976]) in *Brathwaite* v. *Manson*, 527 F.2d 363 (2d Cir. 1975) (a case mentioned in Botelho, 369 Mass. at 873 & n.14) may provide the court with an opportunity to resolve the doubt.

is disfavored generally as a basis of identification (see *Stovall* v. *Denno,* 388 U.S. 293, 302 [1967]; P. Wall, Eye-Witness Identification in Criminal Cases 27-40 [1965]); but such showups of suspects to eyewitnesses of crimes have been regularly held permissible when conducted by the police promptly after the criminal event. Of course, where the circumstances are so exigent as to exclude waiting to arrange a lineup, the case is very clear: in *Stovall* an "immediate hospital confrontation was imperative" (388 U.S. at 302) because the eyewitness was believed to be near death. Exigent or special circumstances, however, are not prerequisite. See *United States* v. *Hines,* 455 F.2d 1317, 1327 (D.C. Cir. 1971), cert. denied, 406 U.S. 975 (1972). Such meetings between witnesses or victims and suspects in custody are often unavoidable or nearly so; and in any event the police procedure of arranging these showups is recognized as usual and natural and justified by the need for efficient investigation in the immediate aftermath of crime. See, e.g., *Commonwealth* v. *Bumpus,* 354 Mass. 494, 501 (1968), cert. denied, 393 U.S. 1034 (1969); Model Code of Pre-Arraignment Procedure 80, 436 (1975). To have the witness view the suspect while his recollection or mental image of the offender is still fresh, before other images crowd in or his attempts to verbalize his impressions can themselves distort the original picture, provides the witness with good opportunity for an accurate identification. See *Russell* v. *United States,* 408 F.2d 1280, 1284 (D.C. Cir.), cert. denied, 395 U.S. 928 (1969); *United States* v. *Hines, supra* at 1327. See generally Buckhout, Eyewitness Testimony, 231 Scientific Am. 23 (1974). A further consideration is that prompt confrontation yielding a negative result, besides freeing the innocent, informs the police that a possible predisposition on their part is or may be in error and releases them quickly to follow another track. *Bates* v. *United States,* 405 F.2d 1104, 1106 (D.C. Cir. 1968). The general view that such speedy confrontations are permissible is accepted in this jurisdiction and elsewhere. See *Commonwealth* v. *Connolly,* 356 Mass. 617, 623-624, cert. denied, 400 U.S. 843 (1970); *Common-*

*wealth* v. *Bumpus, supra* at 501; *Commonwealth* v. *Lifsey,* 2 Mass. App. Ct. 835 (1974); cf. *Commonwealth* v. *Denault,* 362 Mass. 564, 566-567 (1972). See generally, Annot., 39 A.L.R.3d 791, 804-806 (1971 & 1975 Supp.). See also Model Code of Pre-Arraignment Procedure, *supra* at § 160.2(1) (a) & Commentary at 436-438.

The judge could properly hold here that there were no such "special elements of unfairness" (*Russell* v. *United States, supra* at 1284) as might take the case out of the general class permitting a confrontation without lineup. He found, to the contrary, "no indication of any police desire or intention to deal with Barnett unfairly."[7] He also found the police could think the defendant seriously wounded. See *People* v. *Smith,* 18 Ill. App. 3d 859, 864 (1974); *People* v. *Young,* 6 Ill. App. 3d 119, 123 (1972). With Tennyson and the defendant both in the emergency area of the hospital for treatment, it would seem logical and prudent to the police to bring them together. The setting of the hospital confrontation was suggestive, but that of course is true of the class;[8] the considerations mentioned above are thought to outweigh the obvious dangers. (Indeed in the present case suggestiveness was somewhat reduced by the fact that the witness was not made aware that the suspect was under arrest.) The defendant would call the confrontation unfair because it did not take place at the scene of the crime, but he offers no rationale for this position, and the cases have not imposed such a restraint. See *Commonwealth* v. *Connolly, supra* at 623-624 (identification by victim in hospital); *Stovall* v. *Denno, supra* at 295 (same); *Bennefield* v. *Brown,* 228 Ga. 705,

---

[7] It may be observed that if the confrontation had occurred by accident, rather than through honest police procedure, but in equally suggestive circumstances, there would be no question about the admission of the identification. See *Commonwealth* v. *Leaster,* 362 Mass. 407, 410-411 (1972); *Mock* v. *Rose,* 472 F.2d 619, 621 (6th Cir. 1972), cert. denied, 411 U.S. 971 (1973); *People* v. *Canale,* 52 Ill. 2d 107, 112-113 (1972); Model Code of Pre-Arraignment Procedure, *supra* at 438-439.

[8] In *Stovall* the defendant was handcuffed to a police officer and was the only Negro in the room when the eyewitness identified him in response to an officer's question whether the defendant "was the man."

706 (1972); Model Code of Pre-Arraignment Procedure, *supra* at 437-438. The Commonwealth's case would be stronger if the police had in hand a clearer description of the gunman before the hospital confrontation took place, but we think the deficiency not fatal to admitting the identification. Cf. *United States* v. *Hines, supra* at 1328.

We should add that the judge's ruling was not the end of the matter. It meant only that the testimony could be presented to the jury for assessment by them. Tennyson and the others who testified to the identification were subjected to full and vigorous cross-examination by the defendant, and much of the defendant's closing argument was focussed on persuading the jury that the setting of the identification was conducive to mistakes and that the identification was in fact erroneous. See *Russell* v. *United States, supra* at 1285.

2. Although a possible inconsistency had appeared in Tennyson's testimony about the exchange with the defendant on his previous visit at the store (see n.3), the judge refused the defendant's motion to be allowed to examine Tennyson's testimony before the grand jury; the judge referred to the fact that the defendant had access to Tennyson's testimony at the probable cause hearing. This was before a new, prospective rule regarding inspection of grand jury minutes was announced in *Commonwealth* v. *Stewart,* 365 Mass. 99, 105-106 (1974). We need not consider whether the judge exceeded his discretion or whether the defendant properly preserved his rights under the pre-*Stewart* dispensation, since on motion of the defendant we have ourselves read the grand jury minutes, and find nothing in them bearing on the possible inconsistency or otherwise of use to the defendant. See *id.* at 104.

3. At trial, during cross-examination of one of the officers who had observed the hospital confrontation, the defendant asked whether the officer thought Tennyson's condition was serious. The judge excluded the questions and then refused to permit the defendant to make an offer of proof, which would have been (as the defendant says in his brief) that the officer did not think Tennyson was

Commonwealth *v.* Barnett.

badly hurt — attempting thus to attack the propriety of the showup. The defendant claims that the refusal of the offer was error. Strangely, he does not assert that the judge erred in barring the questions. The claimed error may be thereby precluded, but we think it is anyway unsubstantial.

Ordinarily a defendant is not required to make an offer of proof in order to preserve for appeal a ruling excluding a question on cross-examination (see *Civitarese* v. *Gorney,* 358 Mass. 652, 658 [1971]; *Stevens* v. *William S. Howe Co.,* 275 Mass. 398, 402 [1931]); this is because an offer must point to evidence actually available (see 1 J. Wigmore, Evidence § 17, at 313 [3d ed. 1940]), and the cross-examiner will often be unable to state what the answer would have been if the question had been allowed. See Note, 33 N.C.L. Rev. 476, 478 (1955). But should the cross-examiner be permitted to make an offer if he wishes? Yes, "to show the pertinency, not otherwise apparent, of the question excluded" (*Commonwealth* v. *White,* 329 Mass. 51, 52 [1952]),[9] thereby assisting the appellate court and incidentally giving the trial judge a chance to reconsider his exclusion of the question. So, unless the judge is sure of the cross-examiner's purpose and satisfied that it is apparent from the record, he should allow the offer. See, e.g., *People* v. *Camel,* 10 Ill. App. 3d 1022, 1029 (1973), aff'd, 59 Ill. 2d 422 (1974); *Jones* v. *Clark,* 418 P.2d 792, 798-799 (Wyo. 1966); *Abbadessa* v. *Tegu,* 122 Vt. 338, 343 (1961); Annot., 89 A.L.R.2d 279 (1963, 1968 & 1976 Supp.). Rarely will the refusal of an offer on cross-examination in itself constitute reversible error, and certainly not here where the matter of the officer's belief was of less interest to the jury at trial than to the judge on voir dire, and the proof as a whole made it evident that the officers' concern for Tennyson's health was not the basis for the showup.

---

[9] Indeed, where the record did not disclose the reason why the cross-examiner sought an answer to an excluded question, we have held on occasion that an exception might be inadequate in itself to preserve the issue for appeal. See *Breault* v. *Ford Motor Co.,* 364 Mass. 352, 357-358 (1973); *Stevens* v. *William S. Howe Co., supra* at 401-402.

The case of *McGeorge* v. *Grand Realty Trust, Inc.,* 316 Mass. 373, 377 (1944), is not clear on the right of counsel to make an offer.

4. A police officer present at the hospital stated in response to a question by the prosecutor that Barnett "was identified [at the hospital] by the victims as being one of the three men involved in the attempted hold-up and shooting . . . ." The defendant's counsel approached the bench and asked that the answer be struck and moved for a mistrial for prejudice; no hospital identification other than Tennyson's was to be offered at the trial. (See n.2.) The judge denied the mistrial but granted the motion to strike, saying, "The answer was not strictly responsive to the question. It is stricken; and the jury will disregard it."[10] Whether to grant a mistrial is largely a discretionary matter. See *Murray* v. *Foster,* 343 Mass. 655, 660 (1962). We cannot say that the judge. erred in taking the lesser measure of asking the jury to disregard the witness's answer. See the comparable cases, *Commonwealth* v. *Flynn,* 362 Mass. 455, 470-471 (1972), and *Commonwealth* v. *Early,* 349 Mass. 636, 637 (1965).

5. The prosecutor in cross-examining the defendant about his explanation of the shoulder wound put questions as to whether he had told a police officer that he had lost his money in a crap game and as to whether he had had an argument with his wife. The defendant now contends that the convictions should be reversed because the questions were argumentative and suggestive. The contention is not available because the defendant did not object when the questions were first asked and answered. But the questions sought further to impeach the much impeached defendant's testimony, and there is no intimation that the prosecutor was implying the truth of any proposition that he knew to be false, or was otherwise trying to inflame the jury. Cf. *Commonwealth* v. *Redmond,* 370 Mass. 591 (1976).

*Judgments affirmed.*

---

[10] The judge could have reasoned that a statement to the jury in that form would be better than one that directed specific attention to the content of the answer.