COMMONWEALTH vs. BOBBY JOE LEASTER.

Suffolk. January 8, 1985. — June 6, 1985.

Present: HENNESSEY, C.J., WILKINS, LYNCH, NOLAN, & O'CONNOR, JJ.

*Practice, Criminal,* New trial. *Identification. Evidence,* Polygraphic test,
   Hypnotically aided testimony.

Although evidence claimed to have been discovered by a defendant after his
   murder conviction suggested a different version of the circumstances in
   which a witness identified the defendant at a police-arranged confronta-
   tion, in a hospital parking lot about an hour and a half after the crime,
   from that testified to by the witness and a police officer at trial, the
   defendant was not thereby entitled to a new trial, inasmuch as the wit-
   ness's identification of the defendant would be admissible regardless of
   which version of events was accepted as true. [102-105]

INDICTMENT found and returned in the Superior Court on
November 13, 1970.

A motion for postconviction relief, filed on September 9,
1980, and a motion for reconsideration, filed on October 8,
1982, were heard by *John J. Irwin, J.*

   *Robert F. Muse (Christopher J. Muse & Ronald Kovner*
with him) for the defendant.

   *Michael J. Traft,* Assistant District Attorney, for the Com-
monwealth.

   *Daniel E. Callahan & Brownlow M. Speer,* for Committee
for Public Counsel Services & another, amici curiae, submitted
a brief.

   O'CONNOR, J. Bobby Joe Leaster appeals from a Superior
Court judge's denial of his motion for postconviction relief
seeking a new trial under Mass. R. Crim. P. 30, 378 Mass.
900 (1979), and from the denial of his motion for reconsider-
ation thereof.[1] On June 22, 1971, Leaster was convicted of

---

[1] In relevant part, rule 30 provides: "(b) NEW TRIAL. The trial judge upon
motion in writing may grant a new trial at any time if it appears that justice

murder in the first degree, of armed robbery, and of assault and battery by means of a dangerous weapon. The convictions arose out of the robbery of a variety store and the shooting of the store's owner, Levi Whiteside, on September 27, 1970. This court affirmed the convictions on appeal. *Commonwealth* v. *Leaster*, 362 Mass. 407 (1972). In 1977, after the trial judge had retired, another judge denied Leaster's motion for a new trial. In 1980, the same judge denied Leaster's further motion for postconviction relief. A single justice of this court denied Leaster leave to appeal the judge's action, and we dismissed Leaster's appeal of the single justice's decision. *Leaster* v. *Commonwealth*, 385 Mass. 547 (1982).

In 1982, Leaster filed the motion for postconviction relief now under consideration. The same judge who had ruled on the earlier motions denied the motion because of Leaster's failure to submit a supporting affidavit as required by Mass. R. Crim. P. 30 (b) (3). Thereafter, in response to a motion for reconsideration accompanied by an affidavit, the judge conducted a hearing and ruled on the motion for postconviction relief on its merits. He denied the motion and, by the allowance of a motion pursuant to G. L. c. 278, § 33E (1984 ed.), by a single justice of this court, Leaster appeals to the full court. We affirm.[2]

Leaster argues that he is entitled to a new trial because of certain newly discovered evidence. The principal issue at trial was the identity of Levi Whiteside's killer. Levi's widow, Kathleen, and Nellie Rivera, a customer of the store at the time of the shooting, identified Leaster as the killer. Their testimony was crucial on that issue. Also, there was evidence at the trial that Kathleen had identified Leaster at a hospital parking lot approximately one and one half hours after the shooting. The trial judge admitted the evidence of the parking lot identification only after conducting a voir dire, at the conclusion of which he made findings, warranted by the evidence,

may not have been done. Upon the motion the trial judge shall make such findings of fact as are necessary to resolve the defendant's allegations of error of law."

[2] We recognize the brief of amici curiae the Committee for Public Counsel Services and the National Association of Criminal Defense Lawyers.

that we summarize. The shooting occurred at about 4:05 P.M. A few minutes later, two police officers arrived at the scene of the shooting, obtained descriptions of the robbers, and relayed them to police headquarters. Headquarters broadcast the descriptions and, between 5:15 P.M. and 5:20 P.M., Boston division 4 police Officer Frost arrested Leaster. Leaster, at least as to clothing, fitted precisely the description of the alleged assailant. Following headquarters' instructions, Officer Frost drove Leaster in a division 4 police wagon to the Boston City Hospital parking lot where, pursuant to instructions previously received, Frost transferred Leaster to a division 3 police cruiser. The shooting had occurred within the jurisdiction of division 3. As Officer Frost transferred Leaster from one police vehicle to the other, Kathleen Whiteside, accompanied by Sergeant Downey of division 3, came out of the hospital into the parking lot. Upon seeing Leaster, Kathleen stated, "That looks like the man that shot my husband. I'm going over to take a better look." She did that, and said, "That's the man. I see the mark on his eye."

The trial judge also found that, on the morning of the day of the shooting, Kathleen had observed the man who shot her husband, and the man's partner, hanging around the variety store for about thirty minutes. Later, minutes before the shooting, when the two men returned to the store, their presence so aroused Kathleen's suspicion that she suggested to her husband that they call the police. Just before the shooting, the assailant held Kathleen at gunpoint for a least a few minutes. Rivera stared at the assailant face to face for at least three minutes.

The judge found that headquarters had instructed Officer Frost to take the suspect to Boston City Hospital to arrange a confrontation with the victim, Levi Whiteside, and that neither police headquarters nor Officer Frost knew that Whiteside had in fact been pronounced dead at 4:45 P.M. The judge found that the police had not planned a confrontation between Kathleen and the defendant, that the confrontation took place within approximately one hour of the crime, and that permitting the identification to proceed as it did was reasonable police procedure. He concluded that the confrontation

was permissible under *Commonwealth* v. *Bumpus*, 354 Mass. 494, 501 (1968), cert. denied, 393 U.S. 1034 (1969), and *Commonwealth* v. *Connolly*, 356 Mass. 617, 623-624, cert. denied, 400 U.S. 843 (1970).

Finally, the judge found after voir dire that Kathleen had carefully scrutinized the men who had been in the store in the morning and again in the afternoon, and he found that she had "fixed into her mind a mental description of their physical characteristics and their clothing and attire." He concluded that Kathleen's in-court identification had its "preliminary origin in the observations which she made at the time [of the shooting] and is based upon substantial evidence."

Leaster argues that he now possesses evidence, unavailable to him at trial and at the hearings on earlier posttrial motions, that requires a new trial at which Kathleen's out-of-court and in-court identifications would be suppressed. He also contends that, even if he is not entitled to suppression of those identifications, he at least is entitled to present to a new jury previously unavailable evidence which, he contends, would demonstrate infirmities in Kathleen's parking lot identification and, therefore, would minimize the persuasiveness of her in-court identification as well.

The evidence, asserted by Leaster to be newly discovered, is as follows: (1) Officer Frost testified before the grand jury that following the shooting he was on patrol in a police wagon when he heard on the radio that a man answering a particular description was "wanted for murder," that he saw a man fitting that description, and that he took that man to Boston City Hospital to meet Sergeant Downey. In response to a question whether there was any conversation between the victim and Leaster in Frost's presence, Frost answered in the negative and, when asked, "[W]as he dead?," Frost answered, "I believe they just pronounced him dead. It came over the air the man was wanted for murder as well as armed robbery. That is the man we placed in the wagon."[3] (2) A police report that Leaster

---

[3] At the time of the trial, a defendant was required to show "a particularized need" to inspect grand jury minutes of the testimony of witnesses

claims was not produced until the hearing on the motion in question here states: "Lieut. Det. McCallum of Homicide notified by Lieut. Page at 5:00 P.M., date," and "about 5:15 P.M., Patrolman Frost and Erickson . . . arrested [Leaster] without a warrant for the murder of Levi Whiteside." (3) In 1983, at the hearing on the motion now being reviewed, Kathleen Whiteside testified that when the police took her husband from the store they covered his face with a sheet or a blanket, and that when they got to the hospital one of the officers told her that her husband was dead before he left the store. Furthermore, the following questions were asked and Kathleen gave the following answers:

*Q.:*     "When you were leaving the emergency room did something happen?"

*A.:*     "Yes, they came up with the paddy wagon. So they had him in it, in there, and so they carried me out and put me in the car, walked me around and put me in the car. And so they said, 'We have someone out here we want to see do you know.' But just as they was coming around, I looked and saw him. I say, 'That's the guy that shot my husband.' I said, 'What's he doing here like that?' So he said, 'We just wanted you to identify him for us.' "

*Q.:*     "Did they tell you, Mrs. Whiteside, why they brought him there?"

*A.:*     "Yes, they told me why they brought him there."

*Q.:*     "Why?"

*A.:*     "Afterwards."

*Q.:*     "Afterwards. What did they say to you?"

*A.:*     "I recognized him as soon as I saw him."

*Q.:*     "Pardon me?"

*A.:*     "I recognized him no sooner I saw him, and I spoke up before the policemen even said anything to me."

who testified before the grand jury and who subsequently testified at trial. See *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 534-536 (1971). Compare Mass. R. Crim. P. 14 (a), 378 Mass. 874 (1979). At trial, Leaster did not show a particularized need for the grand jury minutes, and they were not made available to him. Instead, the trial judge said that he would read the minutes and, if it appeared to him that defense counsel should have the minutes, the judge would make them available to counsel.

*Q.:*   "After you spoke up and saw him, did they say some-thing to you about this person you are pointing at in the court-room, why they brought him there?"

*A.:*   "I told you they said they brought him there for me to identify him. He wasn't hurting or nothing."

In contrast to that evidence, Officer Frost testified at the trial during voir dire that the information he received on the radio concerned a "shooting" and an armed robbery, and that when he arrived at the hospital he did not know whether the victim was dead or alive. Furthermore, at the voir dire Kathleen Whiteside testified that Sergeant Downey "didn't say anything at all" to her as they left the hospital. "I just looked up and saw [Leaster] as I was coming out of the door," she testified. She did not testify, as she did at the hearing on Leaster's motion, that the police told her after she identified Leaster that they had brought him to the hospital to see whether she could identify him.

1. *Standard of review.* A trial judge's familiarity with a case may lead him or her to conclude, particularly in light of postverdict developments, that justice may not have been done at a defendant's trial. Absent an abuse of discretion, we will not disturb a trial judge's ruling allowing or denying a new trial motion based on newly discovered evidence, even though the cold record may not clearly demonstrate the correctness of that decision. See *Commonwealth* v. *DeChris-toforo*, 360 Mass. 531, 542-543 (1971). However, when the motion judge did not preside over the trial, and the defendant cannot benefit from the judge's first hand exposure to the witnesses, the judge must carefully scrutinize the trial record with a liberal attitude in order to determine fairly whether newly discovered evidence demonstrates that justice may not have been done. This court, too, must perform that care-ful scrutiny. Although we necessarily give deference to the motion judge's assessment of the credibility of witnesses at the hearing on the motion, we are in as good a position as is the judge to evaluate the trial record, so we defer less to the judge's discretion than we do when the motion judge

also presided over the trial. *Commonwealth* v. *Ellison*, 376 Mass. 1, 16-17 (1978).

2. *Suppression of Kathleen Whiteside's identifications*. Leaster argues that the newly discovered evidence shows that, when the police brought him to the parking lot, they knew that the victim had died, and that, therefore, the confrontation between Kathleen and Leaster was not an accidental by-product of an arranged showup between the victim and Leaster, as the trial judge found, but instead was a planned and unnecessarily suggestive one-to-one showup. Leaster asserts that Kathleen's out-of-court identification taints any in-court identification, so that he is entitled to a new trial without evidence of either identification being admitted. In order to dispose of that contention, we need not decide whether the evidence, claimed to be newly discovered, qualifies as such, nor do we need to consider how persuasive that evidence might be with respect to whether the police arranged the confrontation that occurred. Also, we do not need to consider whether that evidence tends to show that, before any identification had been made, the police had told Kathleen that they wanted her to see whether the man they had in custody was the one who had shot her husband. For the purpose of dealing with the suppression argument, we may and do assume, most favorably to Leaster, that the evidence was newly discovered, that Leaster exercised due diligence in uncovering it, that it persuasively showed that the police arranged the parking lot confrontation, and that it also showed that before Kathleen identified Leaster the police told her that they wanted to know if she recognized the person they had brought to the parking lot. We hold that, even were Leaster to establish those facts, evidence of the out-of-court identification would be admissible.

In a long line of cases, beginning with *Commonwealth* v. *Bumpus*, 354 Mass. 494, 497-502 (1968), and *Commonwealth* v. *Connolly*, 356 Mass. 617, 623-624 (1970), both of which the trial judge acknowledged, we have held that due process rights are not violated when the police, promptly after a criminal episode, show a defendant singly to a person for the sole purpose of identifying the wrongdoer. See *Commonwealth*

v. *Bowden,* 379 Mass. 472, 478-479 (1980); *Commonwealth* v. *Storey,* 378 Mass. 312, 316-318 (1979), cert. denied, 446 U.S. 955 (1980); *Commonwealth* v. *Venios,* 378 Mass. 24, 29 (1979); *Commonwealth* v. *Barnett,* 371 Mass. 87, 91-93 (1976), cert. denied, 429 U.S. 1049 (1977); *Commonwealth* v. *Denault,* 362 Mass. 564, 566-567 (1972). Such police procedures are entirely reasonable, *Commonwealth* v. *Connolly, supra* at 624, *Commonwealth* v. *Bumpus, supra* at 501, and it makes no difference that the witness's life is not in such jeopardy as to make imperative the immediate preservation of the witness's account of the event. *Commonwealth* v. *Barnett supra* at 92. The procedures are "justified by the need for efficient investigation in the immediate aftermath of crime. . . . To have the witness view the suspect while his recollection or mental image of the offender is still fresh, before other images crowd in or his attempts to verbalize his impressions can themselves distort the original picture, provides the witness with good opportunity for an accurate identification. . . . A further consideration is that prompt confrontation yielding a negative result, besides freeing the innocent, informs the police that a possible predisposition on their part is or may be in error and releases them quickly to follow another track." (Citations omitted.) *Id.*

Of course, if there are special elements of unfairness, indicating a desire on the part of the police to "stack the deck" against the defendant, an identification resulting from such a confrontation would be inadmissible. *Commonwealth* v. *Moon,* 380 Mass. 751, 756-759 (1980). See *Commonwealth* v. *Storey, supra* at 317-318; *Commonwealth* v. *Barnett, supra* at 93; *Commonwealth* v. *Coy,* 10 Mass. App. Ct. 367, 372-374 (1980). The proposed evidence here does not demonstrate special elements of unfairness in the parking lot confrontation. Although a police officer's statement to Kathleen, before she identified Leaster, that the police wanted to see whether she could recognize the person they had in custody, would contain some inherent suggestiveness, see *Commonwealth* v. *Barnett, supra* at 93, *Commonwealth* v. *Hicks,* 17 Mass. App. Ct. 574, 583 (1984), our decisions do not deem that amount of

suggestiveness either unnecessary or unfair. Therefore, the police officer's statement to Kathleen would render neither the out-of-court nor the in-court identification inadmissible. *Commonwealth* v. *Storey, supra* at 319-320. *Commonwealth* v. *Venios, supra* at 29. See *Commonwealth* v. *Perretti*, 20 Mass. App. Ct. 36, 41-42 (1985); *Commonwealth* v. *Coy, supra* at 376. Accordingly, we find no merit in Leaster's contention that he is entitled to a new trial at which those identifications would be suppressed.

3. *Jury consideration of the circumstances surrounding the parking lot identification.* Leaster argues that, even if the newly discovered evidence does not entitle him to a new trial at which Kathleen Whiteside's identification testimony will be suppressed, he is entitled to a new trial nonetheless because at the 1971 trial he was unable to demonstrate to the jury the suggestiveness of the circumstances in which Kathleen's parking lot identification took place. It is true that "[w]here identification evidence has not been suppressed, its infirmities are a matter for consideration by the jury." *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 308 (1979), and cases cited. However, the new evidence on which Leaster relies does not demonstrate suggestiveness with any more force than the evidence available at trial. Officer Frost's grand jury testimony, the police report, and Kathleen's testimony at the motion hearing would warrant a finding that the police arranged the confrontation between Kathleen and Leaster, but that fact does not demonstrate any suggestiveness in the showup. A showup's suggestiveness results from factors that the witness observes, not from what was in the minds of the police officers. Nothing prevented Leaster from demonstrating the relevant facts at his trial.

As we have stated above, Kathleen Whiteside testified at the motion hearing that, when she was leaving the hospital, the police arrived with a vehicle containing Leaster, that "they put [her] in the car" and "they said, 'We have someone out here we want to see do you know.' But just as they was coming around, [she] looked and saw him. [She said] 'That's the guy that shot my husband.' [She said], 'What's he doing here like that?' So [the policeman] said, 'We just wanted you to identify

him for us.' " In testimony that immediately followed, Kathleen said that she made the identification before the policeman said anything to her. In further testimony, given in response to the prosecutor's cross-examination at the motion hearing, Kathleen repeatedly stated that she identified Leaster before the police said anything to her.

Even if we were to assume that the suggestiveness inherent in a one-to-one confrontation could be exacerbated by the police informing the witness in advance that they have someone in custody for the witness to view for a possible identification, it is questionable whether Kathleen's testimony at the motion hearing would, if presented to a new jury, warrant a finding that any statement made by the police was made before, rather than after, the identification. In any event, we agree with the motion judge that the evidence was not of such a nature as to be likely to affect the result. See *DeLuca* v. *Boston Elevated Ry.*, 312 Mass. 495, 497 (1942).

4. *Other grounds.* Leaster argues that the newly discovered evidence, discussed above, requires a new trial especially when considered in conjunction with certain other evidence: the results of his recent polygraph test indicating the truth of his claim of innocence; his own posttrial hypnotically aided testimony; and the motion hearing testimony of two individuals. Leaster does not rely on this other evidence as independent support for his claim of right to a new trial, but asserts that it adds "substantial weight" to his arguments discussed above. In view of our disposition of Leaster's primary arguments, we need not address those that merely add weight to them. We note, however, that the motion judge found the polygraph examiner to be unqualified. Furthermore, we recently announced our view that hypnosis "lacks general acceptability by experts in the field as a reliable method of enhancing the memory of a witness." *Commonwealth* v. *Kater*, 388 Mass. 519, 520-521 (1983), *S.C.* 394 Mass. 531 (1985). Finally, the testimony of the two individuals consisted almost entirely of hearsay.

We conclude that the judge correctly denied Leaster's motion for postconviction relief. The interests of justice do not require that we grant a new trial.

*Order denying postconviction*
*relief affirmed.*