People of the State of Illinois, Plaintiff-Appellee, v. Walter F. Carroll, Defendant-Appellant.

Gen. No. 53,808.

First District, Second Division.

January 6, 1970.

 

Gerald W. Getty, Public Defender of Cook County, of Chicago (George L. Lincoln and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, Assistant State's Attorney, and Robert Kelty, Special Assistant State's Attorney, of counsel), for appellee.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

On August 14, 1967, Walter F. Carroll, defendant, was indicted by the Grand Jury for the crime of armed robbery. On October 6, 1967, he was tried without a jury, found guilty, and sentenced to a term of one to three years in the Illinois State Penitentiary. This appeal is taken from the judgment of the Circuit Court.

From the record it appears that on July 8, 1967, at about 1:30 a. m., four men entered the I & H Lounge at 2829 West Lake Street in Chicago. The first two stayed near the front bar (one of these was identified as the defendant); the other two went to the rear of the lounge. After drinking and dancing for a time, one of the four announced that there was a stickup; the men ordered all the patrons to the front of the lounge, then took their wallets.

At the trial the defendant was identified as the "second man" by two people—the owner of the lounge, Isaac Nelson, and his sister, Lydia Williams, who was acting as bartender on the night in question. Before this court the defendant argues that the discrepancies in the descriptions of the "second man" given by Mr. Nelson and Mrs. Williams would create a substantial doubt that the

defendant was adequately identified. Both witnesses described the defendant as wearing a straw hat and sunglasses. That fact alone would not necessarily affect the identification; in many cases a semimasked criminal could be properly identified providing the rest of the description was authentic.

Mr. Nelson testified that the defendant was standing near the front of the bar, about four feet from him, and that he had a gun, but Nelson could not describe it. He said: "No, I wasn't noticing him. I was noticing the man who had the gun on me." (The witness here was not referring to the defendant, or "second man.") By his own admission he had not paid much attention to the "second man" (the defendant). He said there had been about ten or twelve people in the tavern before the four men entered, and that the four were there for about thirty minutes before the stickup. We should point out that the opportunity to observe is quite different from actual observation. No particular reason is offered why Nelson would have paid any special attention to any of the four men before the stickup, and he never claimed that he did; he admitted that after the robbery started he did not pay much attention to the "second man." In his testimony he said: "When Mr. Carroll (defendant) was taking the wallets, I'd say I was three or four feet from him. I was facing south, and the people turning over their wallets was facing the north." Questioning continued as follows:

Q. "Facing the north. Now, Mr. Carroll had to be between you and these people, is that correct, sir?"
A. "No, sir. The people was in between me and Mr. Carroll."
Q. "Then Mr. Carroll was on the other side of the people, is that correct?"
A. "I'd say so."

Q. "And the people were standing between you and him, is that correct?"

A. "More or less. Most of them was."

Again, Nelson admitted that his power to observe the man he describes as Mr. Carroll was under far less than ideal conditions. Many people were between them, and this fact alone would have substantially lessened his opportunity to view the man closely. When questioned about hair on the face of the "second man" he said: "If I am not mistaken he had a little goatee." He was further questioned as follows:

Q. "How big a goatee was it?"

A. "Ordinary, like the average guy would wear, I'd say."

Q. "Well, can you describe on what portions of his face the goatee was?"

A. "Have to be somewhere on his mouth."

Q. "Well, was it immediately underneath his lip or was it on his cheeks?"

A. "It was under his lip."

Q. "Did he have anything on his jaw underneath his lip?"

A. "If I am not mistaken, he had something on there. I don't know what it was. I wasn't paying that much attention."

Mrs. Lydia Williams testified that the defendant was in the middle of the tavern, not at the front, as claimed by Nelson. She said the defendant was about 5′ 3″ or 4″ tall and weighed about 130 pounds. Carroll, in fact, is 5′ 10″ or 11″ tall and weighed 168 pounds. Mrs. Williams was asked if he had a mustache and she replied that he had. When asked if that was all she noticed about his face she said: "Mustache, sunglasses, had a straw hat on, and he was dark brownskinned." The Assistant

317

State's Attorney says the defendant admitted he had just started to grow his goatee at that time and would have had only a small stubble. The State argues that Mrs. Williams' testimony should not be rejected simply because she failed to notice a small growth of beard. This line of reasoning fails to take into account the fact that Isaac Nelson testified he did see a goatee on Carroll. Thus, Carroll either did or did not have a beard at the time— not both—and yet Mrs. Williams stated only that he had a mustache.

One week after the incident the defendant walked into the tavern and ordered a beer. Nelson said he noticed him, but "studied" him for a few minutes before calling the police. He said: "I noticed him, and he kept watching me, you know, he knew that I was watching him I guess. I went over and made the telephone call and he turned, he watched me talk on the telephone to the police. I had never seen Mr. Carroll prior to July 8th, 1967." The arresting officer said the defendant offered no resistance; he had been in the tavern for 30 or 40 minutes, and was sitting at the bar drinking beer. We feel it is worthy of note that a guilty party who returns to the scene of the crime is not likely to remain seated when it appears he has been spotted and closely observed, and it is evident that a telephone call has been made as a result of that observation.

Mrs. Williams does not describe the defendant accurately. She was taken to the court by her brother after he had made his identification of the defendant as the robber. The defendant was brought into the courtroom by a bailiff, and he was the only black person in the area except the bailiff. It has been repeatedly recognized that a showup, as distinguished from a lineup, is an unreliable technique for obtaining identifications because of the strong suggestion that the sole person being produced is the criminal. In this case, the inclination to adopt this suggestion was all the more compelling since Nelson had

already concluded that the defendant was the man who committed the crime; therefore, when the defendant was brought out, Mrs. Williams knew she was looking at the man already identified by her brother as the criminal.

It is not necessary to hold that such a method of identification of itself would require reversal, since we have concluded that regardless of the showup technique, the in-court testimony of the identification witnesses was not sufficient to prove beyond a reasonable doubt that Carroll was the criminal. The identification at the trial was inconsistent; however, that fact standing alone might not be sufficient to reverse a conviction. Nelson's version is substantially impaired through his repeated admissions that he was not paying much attention to the second man since another man had a gun on him. He further admitted that patrons were standing between them, making it all the more difficult for him to have adequately observed the man he now maintains was Carroll.

It then appears that the witness in the best position to identify the man said to have been the defendant was Mrs. Williams, yet her description varies considerably from the actual features of the defendant. The identification testimony is made to appear even weaker in view of the circumstances of defendant's arrest. The State argues that in cases where reviewing courts have reversed convictions for failure to adequately identify defendants there have been two conditions present; weak identification testimony and a strong alibi by the defendant. The State further argues that in this case the identification testimony is not weak, a conclusion which must be rejected; and that the defendant offered no alibi. In fact, the State says the defendant does not even recall where he was at the time of the robbery. In reply to that argument it could be said that the defendant in his testimony stated that on July 8 he was on vacation from his job, and was on Madison Street at about 1:30 p. m.,

but could not point out definitely where he was. He said:

> "I was by myself on the morning of July 8th. After picking up my check at noon, I walks from Bell to this currency exchange, and that's where I cashed the check. I drunk a beer around 1:00. I had a beer and went to the movie. I don't know exactly the picture I went to the Four Star. To be honest, I really don't know the movie. The movie was around 1:15. They always show two movies. I left the show around 5:00. I went home. I know I didn't drive home, because I don't have no car. I may have caught a bus. I guess I got home around 5:00 or 6:00. I did not meet anybody. I did not stay home. . . .
>
> "When I left my hotel about 7:30 I wasn't going nowhere special. I went to a neighborhood lounge. I think the name is Doll House or something. I socialized. I talked. I don't recall who I socialized with. I don't know when I left there. I didn't stay there all night. I can't pinpoint no place I went."

The crime was committed on July 8, 1967, and the trial was not held until October 6, 1967. The defendant was asked to account for his whereabouts on a date some 90 days earlier. We do not believe that anyone could have been any more accurate under the circumstances. In any case, criminal convictions are obtained on the strength of the State's case and not on the weakness of the defendant's. The State must obtain a conviction on the basis of proving beyond a reasonable doubt that the defendant committed the crime charged, and it does not accomplish that by pointing out the defendant's failure to provide an airtight defense. In its brief the State says: "The testimony of the identifying witnesses was

sufficient to convict *in light of the naked denial by the defendant.* People v. Donald, 29 Ill2d 283; People v. Cox, 22 Ill2d 534." (Emphasis supplied.)

■ The cited cases do not support the State's argument; they only hold that when the identification testimony is positive and the witness is credible, that testimony is sufficient to convict even in the event the defendant denies committing the crime. It is for the trier of fact to resolve such disputes and to determine who is telling the truth. We agree with the conclusions in Donald and Cox, but we disagree with the State's interpretation of what those cases held.

■ One's denial of participation in a crime certainly does not entitle defendant to an acquittal, and his denial must be taken into consideration together with the State's evidence of guilt. The trier of fact should resolve the conflict between the two versions; however, in the present case, we must conclude that no choice was necessary since the State's evidence was not sufficient to sustain a conviction. The function of choosing between two versions arises only when the State presents what would otherwise be an adequate case, and thus the trier of fact must determine whether the defense has adequately rebutted the State's presentation.

■ In the case before us the evidence presented by the State was not sufficient to sustain a conviction. Isaac Nelson's testimony was vague and varied from that of his sister, Mrs. Williams, whose testimony included a description of estimated height and weight, both of which differed substantially from the facts. We cannot say that this is the kind of "clear and positive" identification referred to in many cases which have sustained convictions. On the contrary, there were too many inconsistencies and variances in the testimony presented.

Accordingly, the judgment of the Circuit Court finding the defendant guilty is reversed.

Reversed.

BURKE and LYONS, JJ., concur.