THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHARLES BYAS, Defendant-Appellant.

Third District No. 82—351

Opinion filed September 7, 1983.

BARRY, J., dissenting.

Robert Agostinelli and Thomas A. Lilien, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin, Gerry R. Arnold, and Rita Kennedy Mertel, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE ALLOY delivered the opinion of the court:

The defendant was charged with one count of rape and two counts of armed violence. In a bench trial, the court convicted him of all charges and sentenced him to concurrent terms of 20 years in prison.

The complainant was 13 years old at the time of the rape. On October 5, 1981, sometime between 8:15 and 8:20 a.m., she left home to walk to school. As she was walking along a sidewalk, a car stopped on the opposite side of the street. She described the car to police as a two-door, black over burnt orange 1968 or 1969 Buick. A man got out of the car, looked at its tires, and crossed the street to intercept the complainant. The complainant testified that she did not have a long time to see the man's face.

The man displayed a gun and ordered the complainant into the back seat of the car. He took the books she was carrying and placed them under the seat. According to the complainant, he was not wearing gloves. The man covered her head with a blanket and ordered her to stay down. After driving for about three minutes, he stopped, climbed into the back seat, removed the complainant's clothes and took off his own clothes. The blanket was still covering her face. The man put the gun to the complaint's head and told her to do as he ordered. As he began to rape her, she tried to push him away, discovering that he had a hairy chest. She also had a brief opportunity to see the man when the blanket momentarily fell from her eyes.

After the rape, the man dressed the complainant and then himself. He blindfolded her with a torn towel and told her his name was Thomas. The man moved the complainant out of the car and handed her books to her. When she heard him drive away, she removed the towel, ran home, reported the incident to her mother and called the police.

The initial information which the complainant gave to the police described her assailant as a black male, six feet tall, 170 pounds, in his early twenties and wearing blue jeans. During an in-depth police investigation the next day, the complainant revised and expanded her description of the attacker, stating that he was approximately 23 years old, 5 feet 11 inches tall, 175 pounds and darkly complected. She also told the police that the man had a soft voice, short hair, a slight beard and mustache and hair on his chest. She also said that

the man wore blue jeans, white gym shoes and a black leather jacket.

To establish the identity of the defendant as the assailant, the State primarily relied upon the complainant. After the complainant assisted the police in making a composite drawing of her attacker, one of the police officers assembled a photographic display of known sex offenders. According to this officer, the complainant stated, "[t]hat's him," when she saw the defendant's photograph. The complainant, however, testified that she selected the defendant's photograph in response to the police officer's instructions to select the man that most resembled her assailant. She also testified that the police officer asked her if the defendant's photograph most resembled her attacker.

Based on the complainant's selection of the defendant's photograph, the police arrested the defendant and placed him in a lineup with four other men. The defendant was represented by counsel at the lineup. After the complainant received directions from the officers, she viewed the men for 20 minutes. During this time, each man read aloud statements which the assailant made to the complainant. The complainant was behind a one-way mirror during the viewing. Each man stepped within two feet of the complainant. After viewing all the men, everyone in the viewing room moved to a conference room and a police officer asked the complainant to select the man who looked familiar. The complainant was unable to identify anyone and stated that no one looked familiar. At this point, the defense counsel departed the police station. Shortly afterwards, the police officer asked the complainant to disregard the voices and identify anyone who looked familiar. The complainant selected the defendant. At the trial, the State introduced evidence of the lineup identification.

The State also introduced evidence of the complainant's identification of the defendant at a preliminary hearing. At this hearing, the complainant was asked to identify her assailant in court. She asked to have the defendant stand, move closer to her and speak. When she was asked to make the identification, the complainant hesitated, but eventually identified the defendant as the man who raped her. At the trial, the complainant promptly and positively identified the defendant, who was seated at the defense table, as her assailant.

The State attempted to corroborate this identification with scientific evidence and evidence of a prior rape by the defendant to establish a *modus operandi*. The State produced an expert witness who testified that the semen found on rectal and vaginal swabs could have come from the defendant. The blood type in the semen was type O, which is the same type as the defendant and the complainant. Over 40% of the population has type O blood and 60 to 80% of the popula-

tion will secrete their blood type in their body fluids. The expert also testified that he tested the defendant for the enzyme PGM. The defendant has a PGM of 1. This same PGM was found in the vaginal swab. The expert failed, however, to test for PGM in the complainant. According to this expert, though, all males secrete PGM in their semen, while women do not secrete it vaginally or do so only in low concentrations. Thus this expert concluded that all the PGM could not have come from the complainant alone.

A defense expert also testified as to his findings in regard to the blood types. Although he disputed some of the methods and conclusions of the State's expert, he also agreed that the defendant could not be ruled out as the source of the semen. The defense expert also testified that approximately half the population has type O blood and over half the population has a PGM of 1.

The same expert for the State testified that he conducted tests and comparisons between hair samples of the defendant and hairs found on the complainant's body. According to this expert, a fragment found on the complainant's bra was similar in diameter and color to the defendant's pubic hair. The expert also compared two hairs that were found on the complainant's socks and shoes. He concluded that these hairs were similar in color and pigmentation to the defendant's head hair. This expert testified, though, that the defendant's hair displayed a very wide range of traits. The defense also produced expert testimony on this point. In uncontradicted testimony, the defense expert explained that almost all dark pigmented hair would be consistent with the fragments found on the complainant. The defense expert agreed that the defendant could not be ruled out as a possible source of the hairs.

Finally, the State introduced the testimony of Sandra Hernandez, the victim of a rape in which the defendant participated. Ms. Hernandez was 20 years old at the time of her attack. On April 28, 1979, at 2 or 2:30 a.m., she was walking along a street towards her uncle's house. A car followed her slowly for five or six miles. The driver continually asked her if she wanted a ride. Ms. Hernandez repeatedly refused. Eventually, she stopped at an all-night convenience store. After she left the store, she continued walking. As she saw the car ahead, parked in a driveway, someone grabbed her from behind, put something in her side and threatened to kill her if she was not silent. The car backed up, and she was placed on the floor of the back seat. The man also put a stocking cap over her face and took her purse. Ms. Hernandez testified that she saw the driver but not the man who grabbed her. The men drove to a garage, where one man climbed into

the back seat, removed her clothes and his own clothes and raped her. When this man left the car, the other man entered it and raped her.

When the second man finished, he told Ms. Hernandez to get dressed. They ordered her to stay on the floor while they were driving. The man returned Ms. Hernandez' purse to her, although they removed several items from it. When they released her in an alley, the men threatened her once more, removed the stocking cap and departed. The defendant later confessed to involvement in this rape.

The defendant presented an alibi defense. The essence of his alibi is that he was with his wife and sisters at the time of the offense. His wife and one of his sisters testified in support of this alibi. All of them testified in detail as to their activities on the morning of the crime. Although their recollection differed as to particular times of some events, everyone agreed that the defendant was at home at the time of the crime. On cross-examination, the State confronted the wife and sister with prior statements made to police officers on the day of the defendant's arrest. When the police came to arrest the defendant, the wife said she had "nothing to do" with the defendant or his family. On that same day, the sister suggested to the police that the defendant was in Louisiana, even though she had seen him that morning.

At the close of the trial, the court found the defendant guilty of all charges. The defendant now appeals, alleging several errors, including the State's failure to prove the defendant guilty beyond a reasonable doubt. We agree with this contention and reverse the defendant's conviction.

Although a reviewing court will not substitute its judgment for that of the fact finder on matters of weight and credibility, a conviction cannot be sustained if the identification of the accused is vague, doubtful or uncertain. (*People v. White* (1978), 56 Ill. App. 3d 757, 372 N.E.2d 691.) Moreover, "[i]f a conviction is to be sustained, it must rest on the strength of the People's case and not on the weakness of the defendant's case." (*People v. Coulson* (1958), 13 Ill. 2d 290, 296, 149 N.E.2d 96.) In this case, the evidence of the defendant's identification is insufficient to sustain his conviction.

The State, citing *People v. Berry* (1980), 86 Ill. App. 3d 755, 408 N.E.2d 466, argues that a positive identification by a single witness who had an adequate opportunity to observe her assailant is sufficient to support a conviction. The State also notes that the lack of extended opportunity to view the assailant does not vitiate an otherwise positive identification. *People v. Henderson* (1976), 36 Ill. App. 3d 355, 344 N.E.2d 239.

In this case, however, the victim did not make a positive identification of the defendant. The State's evidence is in conflict concerning the photographic display. The police officer testified that she heard the complainant identify the defendant as her attacker when she saw his photograph. The complainant, however, testified during direct examination that she picked the defendant's photograph only in response to the officer's request to select the man who most resembled her assailant. The complainant explained that this picture looked most like the man who raped her.

Similarly, the lineup identification was equivocal. The complainant was unable to identify the defendant after viewing the lineup for 20 minutes. Her eventual identification of the defendant was not positive or certain. On the contrary, she told the police, in response to an inquiry of whether anyone looked familiar, that the defendant looked most similar to the man who attacked her.[1]

During the preliminary hearing, the complainant again had difficulty identifying the defendant as her assailant. The State argues that her hesitancy is merely a result of the complainant's exercise of great care not to accuse an innocent man. This explanation is in marked contrast to the State's position at the hearing, when the prosecutor told the court, "I think it's clear here that there is an issue as to whether this witness can identify this man who is sitting over at that table." Only at the trial, after viewing the defendant or a photograph of him three times, did the complainant promptly identify the defendant, who was seated at the defense table.

■ In addition, the complainant's description of her assailant substantially differs from the actual physical characteristics of the defendant. The complainant initially described her assailant as being six feet tall, 170 pounds and in his early twenties. The next day, during a police interview, the complainant revised her description of the

---

[1]The defendant properly raises the issue of whether this testimony should have been excluded because the police violated his right to counsel during the lineup. The defendant was arrested and charged by complaint with rape, so he had a sixth and fourteenth amendment right to counsel during the lineup. (*Gilberg v. California* (1967), 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951; *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877 (plurality opinion).) Violation of this right requires exclusion of the lineup identification evidence. (*Gilberg; People v. Swift* (1980), 91 Ill. App. 3d 361, 414 N.E.2d 895.) At the least, a new trial would be required in the case at bar, because the equivocal identification and the lack of meaningful corroborative evidence would restrain us from finding the testimony harmless beyond a reasonable doubt. *Swift.*

attacker, stating that he was 5 feet 11 inches tall, weighed approximately 175 pounds, was approximately 23 years old, darkly complected and had a hairy chest. In fact, the defendant is 5 feet 7 inches tall, weighs 147 pounds and has no hair on his chest or stomach. The State calls these discrepancies "minor." These are not trivial variances, and the State's evidence offers no explanation for these differences. (*People v. Marshall* (1966), 74 Ill. App. 2d 483, 221 N.E.2d 133. See also *People v. Carroll* (1970), 119 Ill. App. 2d 314, 256 N.E.2d 153 (substantial variance in height, weight and presence of beard); *People v. Barney* (1965), 60 Ill. App. 2d 79, 208 N.E.2d 378 (variances in height, weight and posture).) In particular, the absence of a physical characteristic which the witness claims the defendant possesses undercuts the strength of her identification. (*Cf. People v. King* (1973), 10 Ill. App. 3d 652, 295 N.E.2d 258 (failure to assert a distinctive physical feature which the defendant possesses is *prima facie* inconsistent conduct which, unexplained, tends to discredit the witness).) The State coyly contends that the trial court observed the defendant's chest and could determine for itself the degree of hair on it. The uncontradicted evidence is that the defendant has no hair on his chest.

■ Additionally, there is no meaningful corroboration of the defendant's identification. The scientific evidence demonstrates that the defendant cannot be excluded as a possible assailant. Almost half the population has type O blood and a PGM of 1. Alone, this evidence is far too vague to provide meaningful corroboration. Similarly, the State's expert testimony on the hair samples indicates that the defendant could not be excluded as a possible source. The same witness, however, also testified that the defendant's hair displays a very wide range of physical characteristics. Moreover, the uncontradicted testimony of the defendant's expert is that every darkly pigmented hair would be consistent with the fragment found on the complainant.

■ Furthermore, the State never produced the clothing that the defendant allegedly wore on the morning of the attack. The State never found the automobile that the defendant allegedly used, nor could it even trace any car to him. In uncontradicted testimony, the defendant denied owning an automobile. In addition, the defendant's fingerprints were never found on the complainant's books, which he is supposed to have handled twice during the attack. In a curious argument, the State contends that this corroborates the identification, because while the defendant's fingerprints were not on the books, neither were anyone else's. Suffice it to say, the absence of evidence, where its presence is required, is not sufficient corroboration of an

identification.

 Finally, the defendant's involvement in a prior rape is insufficient corroboration of the defendant's identity in the case at bar. Evidence of extra-indictment offenses can be admitted to demonstrate a defendant's *modus operandi*. (*People v. Tate* (1981), 87 Ill. 2d 134, 429 N.E.2d 470.) To be probative, and hence corroborative, there must be a strong and persuasive showing of similarity of the offenses and the evidence must show that both crimes were " 'so nearly identical in method as to earmark them as the handiwork of the accused.' " *People v. Emmett* (1975), 34 Ill. App. 3d 167, 170, 340 N.E.2d 235, citing with approval McCormick, Evidence sec. 190, at 449 (2d ed. 1972). See also *Tate; People v. Osborn* (1977), 53 Ill. App. 3d 312, 368 N.E.2d 608, *cert. denied* (1978), 439 U.S. 837, 58 L. Ed. 2d 134, 99 S. Ct. 122.

 The evidence of the defendant's prior rape is not sufficiently similar to the offense charged so as to be corroborative of his identity. In the prior offense, the defendant acted with an accomplice in the middle of the night. The defendant and his accomplice stalked the victim for six miles, eventually seizing her from the rear. The defendant always kept the gun hidden and they released the victim only after they moved her to another location. In the case at bar, however, the assailant attacked the complainant by himself and in daylight. The assailant approached the complainant almost immediately after he spotted her. The assailant approached the complainant directly and openly displayed his gun. He also released the complainant in the same spot as where the rape occurred.

The State argues that there are similarities between the two crimes: Both women were attacked in the same area; both assailants used cars and guns; both victims were placed in the back seats of the cars; both victims were told to do as they were told or they would be killed; both victims were blindfolded; both assailants took off the victims' clothing; and both rapes occurred in the back seat. These similarities, though, are common to many sexual attacks and are not so distinctive as to earmark them as the handiwork of the defendant. (See, *e.g., People v. Camel* (1974), 59 Ill. 2d 422, 322 N.E.2d 36 (16-year-old victim accosted by man while walking to school, eventually forced into the back seat of car and blindfolded, told to be silent under threat of death, disrobed by assailant and raped in the back seat).) The State also makes much of the fact that, in this case, the assailant told the complainant that his name was Thomas. In the prior rape, according to the State, the defendant told the victim that his name was Clay. Thus, the State sees another similarity between the two rapes.

There is no basis for this assertion in the record. Ms. Hernandez testified that the defendant was called Clay. There is no evidence that he volunteered the information to her.

The lack of positive identification by the victim and the absence of meaningful corroborative evidence requires this court to reverse the defendant's conviction.

In his appeal to this court, the defendant also raises an issue concerning the use of hypnosis on the complainant by a police investigator. During the police investigation, but prior to the photographic identification, an investigator with some training in psychotherapy placed the complainant under hypnosis in order to illicit additional information from her. The defendant argues that the hypnosis irreversibly contaminated the testimony and that the trial court should have barred the complainant from testifying, or at the least should have suppressed her identification testimony.

Our resolution of this appeal makes it unnecessary to determine this issue. We note, however, that most courts which have addressed this question have ruled that the suggestiveness in a hypnosis session may affect the credibility of the witness, not the admissibility of the testimony. (*E.g., People v. Smrekar* (1979), 68 Ill. App. 3d 379, 385 N.E.2d 848; *United States v. Adams* (9th Cir. 1978), 581 F.2d 193; *Clark v. State* (Fla. App. 1979), 379 So. 2d 372.) We agree with this approach. We are mindful, however, that in a particular case, the peculiar hypnotic procedure may be "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States* (1968), 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971. *Cf. Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (identification testimony which resulted from an unnecessary and suggestive pre-trial photographic or show-up identification procedure may be admitted into evidence without violating defendant's right to due process, only if the identification possesses sufficient aspects of reliability).

It is unnecessary to rule on the remaining issues raised by the defendant. The judgment of the circuit court of Will County is reversed.

SCOTT, J., concurs.

JUSTICE BARRY, dissenting:

I agree with the defendant and my colleagues that the principal issue at the trial of this cause was the identification of the assailant of Leticia Hernandez, which I will later address. However, I would not

reverse the judgment of the circuit court and will therefore address all the other issues presented by the defendant.

On October 5, 1981, a 13-year-old female child was raped. She asked the assailant, "Why me?" and he responded that he liked Mexicans and that he had been watching her for a long time. Upon being released by the assailant, the victim immediately went home, reported the incident to her mother, and then called the police. She was taken to the local hospital where the rape was medically verified. On October 6 she gave an in-depth interview to the officers and described the assailant. Subsequent thereto, on October 9, hypnosis was performed by an officer without any suggestions whatsoever regarding any description of this defendant. Sometime thereafter the victim identified the defendant from a series of photographs. Later she identified the defendant at a physical lineup procedure, and then again in court.

The defendant claims that the identification testimony of the complainant should have been suppressed or excluded because she was hypnotized before trial. As indicated above by the majority, most courts have ruled that the suggestiveness in a hypnosis session is a factor that may affect the credibility of the witness, not the admissibility of the testimony, and here we have a session without any semblance of suggestiveness whatsoever. In fact, the victim gave her description of the assailant prior to the hypnosis; the session was tape recorded and the lack of suggestiveness therein verified. Nothing resulting from the hypnosis changed her description of the defendant, except to then add that he was "ugly." The court ruled that hypnosis did not taint the identification. Obviously the victim's identification had an origin which is independent of any suggestiveness and was not tainted by the hypnosis. Therefore the identification testimony was not inadmissible by reason of the hypnosis.

The defendant also claims that his identification subsequent to the lineup should have been suppressed because he was not represented by counsel when the identification was made. Certainly there is no right *per se* to counsel at the identification made prior to the commencement of the prosecution. (*Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877.) And, as certainly, it is unquestioned that after formal criminal proceedings have been instituted against the defendant, the defendant has a right to have counsel present at an in-person lineup. (*United States v. Wade* (1967), 338 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926.) Here the defendant was represented by counsel at the lineup. It is uncontroverted that the voices of those participating, including the defendant, at the lineup could not be heard. The victim did not identify the defendant until subsequently

asked, shortly after the defendant's representative had left, whether she could identify the assailant without having also heard his voice, and then she did. What occurred outside of the presence of the defendant's counsel was testified to by Leticia and Officer Jencon; the credibility of that testimony was for the trial judge to determine, and he obviously found that no activity adverse to the defendant occurred. As in *State v. Kimball* (1976), 14 Wash. App. 951, 546 P.2d 1217, in an analogous factual situation, the court held that even though counsel was not present at the identification, the identification was admissible. By my view the admission of the additional lineup identification was not reversible error.

The next issue presented by the defendant is whether the trial court failed to exercise properly its discretion when it arbitrarily denied the defendant's pretrial motion *in limine* to exclude evidence of other crimes. Defendant's argument is without merit. The trial judge's remarks at the pretrial hearing, granted on the defendant's motion, indicate that he was exercising his discretion. Clearly he did not refuse to consider the motion *in limine*. Under the facts presented in the instant case only the defendant's supposition suggests arbitrariness.

In exercising its discretion, the trial court should determine whether the probative value of the evidence outweighs the danger of unfair prejudice to the defendant. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.) As has been heretofore indicated, the principle issue here is the identity of the perpetrator. One of the most legitimate uses of other crimes evidence is where identity is at issue. (See *People v. Therriault* (1976), 42 Ill. App. 3d 876, 356 N.E.2d 999.) In the instant case, the prime characters are a 13-year-old female victim and a defendant with a sex offense record. The defendant's claim that he was denied a fair trial when the trial court allowed the State to introduce evidence of his prior criminal conduct at a bench trial is without merit. The other crime was the sexual assault of another 20-year-old Mexican female in the same neighborhood, which was admitted by the defendant. The trial court properly admitted that evidence to establish the defendant's *modus operandi*. The facts are sufficiently similar, as has been detailed otherwise by the majority, in my opinion.

The defendant's next argument, that the permitting of cross-examination of the defendant about his past possession of a gun was erroneous, is also of little merit. The defendant testified on direct that he did not have access to a gun on the date of the instant offense. I believe it is within the discretion of the trial judge to allow cross-ex-

amination to test credibility regarding the subject matter. See *People v. Gray* (1980), 85 Ill. App. 3d 726, 410 N.E.2d 493.

While the State concedes that the defendant's conviction for armed violence based upon the offense of indecent liberties must be vacated, the State does not agree that the offense of armed violence based upon the offense of unlawful restraint should be vacated. This defendant was convicted of both rape and armed violence based upon the underlying offense of indecent liberties with a child, the same act of sexual intercourse, and thus one of the two convictions must be vacated. (See *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1, and *People v. Olejniczak* (1979), 73 Ill. App. 3d 112, 390 N.E.2d 1339.) The People elect that the conviction of armed violence (indecent liberties with a child) be vacated.

However, this defendant's conviction for armed violence based upon unlawful restraint may stand. (See *People v. Schultz* (1979), 73 Ill. App. 3d 379, 392 N.E.2d 322.) The two offenses were separately accomplished and not part of one physical act. The defendant accosted the victim as she walked down the street, held a gun on her, and forced her into the back seat of his car. Thereafter, after driving her to a different location, he proceeded to rape her. The offenses are not included within the same section of the criminal code. Both convictions may stand.

The defendant also argues that the offense of unlawful restraint cannot be used as a predicate felony. It is the People's contention that the legislative intent is clear that armed violence may be based upon a Class 4 felony of unlawful restraint, because "a person commits armed violence when, while armed with a dangerous weapon, he commits *any felony* defined by Illinois Law." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 33A—2.) The language should be given its plain meaning. Had the legislature intended that the offense of unlawful restraint not be a predicate offense for armed violence, it could have easily so provided as an exception. Prosecutorial discretion must be recognized. (*People v. Graham* (1975), 25 Ill. App. 3d 853, 323 N.E.2d 441.) And, we have held the general statutory construction rule requiring that a specific statute prevail over a general one is not sufficient to demonstrate a legislative preference for prosecution under one applicable statute rather than another (*People v. Cole* (1980), 84 Ill. App. 3d 347, 405 N.E.2d 347), I would hold that "any felony" means any felony.

Whether the vacatur of the armed violence conviction based upon indecent liberties mandates a remand for resentencing, is the final issue put by the defendant. I would rule not. In the recent supreme

court case of *People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E. 477, Justice Ward writing for the majority observed there that the trial court had imposed concurrent sentences for both armed violence and the underlying felony, that both convictions could not stand, but that remandment was unnecessary. The record here shows that this defendant previously pleaded guilty to the offenses of kidnaping and intimidation after having been charged with two rapes, and it is clear that the sentences imposed in the instant case are justified independently of each other. Under the circumstances, remandment for resentencing is unnecessary.

Finally, with regard to the superseding issue, whether the defendant's identity as the victim's assailant was proved beyond a reasonable doubt, defendant's position is that the total evidence presented by the State failed to so establish, while the People's position is that the identification was positive and sufficiently corroborated.

Though a judge, as fact finder, is required to resolve all facts and circumstances in evidence on the theory of the defendant's innocence, rather than his guilt, if that can reasonably be done (*People v. Sheppard* (1949), 402 Ill. 347, 83 N.E.2d 587), here, in my opinion, we do not have such a case. The record indicates that the victim, a 13-year-old female, gave a description of this defendant prior to any hypnosis, and did not vary that description except for minor discrepancies through the trial, hesitating only because she preferred both at the lineup and at trial to hear the defendant speak as well. Her concern for the truth seems obvious. Her identification was positive, and without any hesitation when she initially identified the defendant by photograph. The only questionable factor included in her testimony was whether the assailant had a hairy chest, as she indicated he did in cross-examination, and that factor was specifically a subject for the judge's observation and determination as the finder of fact. The trial judge witnessed the removal of the shirt of the defendant to view the defendant's chest; the defendant was allowed to put his shirt back on, and thereafter the defendant was asked by his counsel whether he had ever used any artificial means of removing hair, and he responded negatively. Obviously defendant's credibility and what is a hairy chest in the eyes of a 13-year-old, and what is a chest with or without some hair were for the trial judge to decide.

This victim had an opportunity to view her assailant for some 10 or 15 seconds while he crossed the street, when he put a gun on her and caused her to get into the back seat, and thereafter when he put a blanket over her face. Afterwards it would appear that she pulled the blanket down, looked at the back of the assailant's head for a

time, and then he caught her and caused the blanket to be again put over her face. Thereafter at various times he replaced the blanket over her eyes with her blouse, and then again the blanket, and thereafter he placed a towel over her eyes. Her level of certainty at the confrontation with the assailant were factors to be considered by the trial judge in evaluating the reliability of her pretrial identification and her testimony. In addition there was some corroboration of the identification. All the expert testimony regarding hair samples and semen did not exclude the defendant. Further the attack upon Sandra Hernandez was admitted by this defendant. In my opinion the identity testimony by the victim was clear and convincing.

Most importantly, the evidence here is not so culpably contrary to the finding or so unreasonable, improbable or unsatisfactory as to cause reasonable doubt as to the guilt of the accused. (*People v. Peyton* (1980), 84 Ill. App. 3d 181, 405 N.E.2d 18.) It should be noted that all of the defendant's alibi witnesses were thoroughly impeached. My consideration of the record and the well-done briefs presented to us in this case do not suggest that we should overrule the trial judge in this bench trial. I would vacate the armed violence based upon indecent liberties conviction, and affirm the convictions for rape and armed violence based upon unlawful restraint.