THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE SLIM, Defendant-Appellant.

First District (5th Division)   No. 86—1497

Opinion filed July 17, 1987.—Rehearing denied February 2, 1988.

Paul P. Biebel, Jr., Public Defender, of Chicago (James N. Perlman, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., James E. Fitzgerald, and Eugene Hollander, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

After a bench trial, the defendant, Willie Slim, was found guilty of armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a)) and was sentenced to six years' imprisonment. His sole contention on appeal is that the victim's single identification testimony of him as the robber was wrought with inconsistencies, was not clear and convincing and failed to establish beyond a reasonable doubt that the defendant was the robber. The defendant insists that his conviction should therefore be reversed.

The Supreme Court of the United States in vacating the defendant's robbery conviction in *United States v. Wade* (1967), 388 U.S. 218, 228-29, 18 L. Ed. 2d 1149, 1158-59, 87 S. Ct. 1926, 1932-33, stated:

"[I]dentification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eyewitness identification are well-known; *the annals of criminal law are rife with instances of mistaken identification.* Mr. Justice Frankfurter once said: 'What is the worth of identification testimony even when uncontradicted? *The identification of strangers is proverbially untrustworthy.* The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of ancient criminal procedure.' The Case of Sacco and Vanzetti 30 (1927). A major factor contributing to the high incidence of miscarriage of jus-

tice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. A commentator has observed that '[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined.' Wall, Eye-Witness Identification in Criminal Cases 26. Suggestion can be created intentionally or unintentionally in many subtle ways. And *the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial,* and thus his susceptibility to suggestion the greatest.

Moreover, '[i]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.' " (Emphasis added.)

■■ ■ The adequacy of the victim's opportunity to identify the robber, the amount of time the victim observed the robber, the proximity of the victim to the robber, the victim's anxiety, fear and excitement, the extent of the victim's attention to the robber's features, the lighting conditions, the thoroughness and accuracy of the victim's description of the robber, the length of time between the robbery and the victim's subsequent identification of the robber are factors which are considered in determining whether a victim has correctly identified the robber beyond a reasonable doubt. (*People v. Brown* (1982), 110 Ill. App. 3d 1125, 1128, 443 N.E.2d 665; *People v. Baker* (1979), 78 Ill. App. 3d 411, 416, 396 N.E.2d 1174.) The victim's failure to initially observe a particularly distinctive or unique physical characteristic of the person the victim subsequently identifies as the robber is also a factor in determining the authenticity of the victim's identification. Variances between the victim's description of the offender and the description of the defendant may raise a reasonable doubt of the identification and the defendant's guilt. (*People v. Byas* (1983), 117 Ill. App. 3d 979, 986, 453 N.E.2d 1141.) Moreover, the trial court's finding of guilt must be reversed on appeal where the evidence is to improbable that it raises a reasonable doubt of the defendant's guilt. (*People v. Baker* (1979), 78 Ill. App. 3d 411, 417, 396 N.E.2d 1174.) A conviction cannot rest upon an identification which is doubtful, vague or uncertain or where there

are significant discrepancies between the victim's description of the assailant and the description of the defendant. (*People v. Marshall* (1966), 74 Ill. App. 2d 483, 485, 221 N.E.2d 133.) Application of the foregoing principles to the case at bar compels reversal.

The robbery victim, Porter Sledge, testified that he was a part-time Cook County deputy sheriff. On August 3, 1985, at approximately 1:45 a.m., he parked his 1983 Cadillac automobile at 5616 South Indiana Avenue in Chicago. As he walked from his car down the street, a man whom he had never seen before approached him. When the man was one or two feet from him, the man stuck a gun in his face and took his money, wallet and car keys. The robber backed away to Sledge's car, unlocked the door, entered the car and drove away. Sledge immediately reported the robbery to the police and gave the officers a description of the robber.

On August 13, 1985, 10 days after the robbery, the defendant and several other individuals were arrested in Milwaukee, Wisconsin, while in Sledge's car, which had Wisconsin license plates affixed to it. The defendant was a passenger in the car. The identity of the driver of the car and the other passengers was not established.

On the following day, Sledge went to Milwaukee, where he viewed a six-man lineup and identified the defendant as the person who had robbed him. Although a picture was taken of the lineup and was received in evidence as State's exhibit No. 1, the lineup picture however is not contained in the record on appeal. Moreover, the evidence does not reveal the identity or description of the five other lineup participants. Nor does the record disclose whether any of the other men in the lineup were any of the men who were arrested in Sledge's car with the defendant.

Sledge further testified at trial that he initially described to the police the robber's age as 28 years. The uncontradicted trial evidence of the defendant's father, Rotation Slim, a defense witness, established however that the defendant was born on September 13, 1964, and was 20 years of age when the robbery was committed on August 3, 1985. Thus, Sledge was mistaken by eight years on the robber's and the defendant's age.

Sledge also testified at trial that he initially reported to the police that the robber weighed 135 pounds. Yet the uncontradicted trial testimony of the defendant's father established that the defendant weighed 165 to 170 pounds. Thus, Sledge was mistaken by 30 to 35 pounds on the robber's and the defendant's weight.

Sledge further testified that he was 5 feet 9 inches tall and that he initially described the robber to the police as being 5 feet 3

inches tall. The uncontradicted testimony of the defendant's father, established however that the defendant was 5 feet 9 inches tall—the same height as Sledge. Thus, Sledge was mistaken by six inches on the robber's and the defendant's height. Moreover, a 5-foot 3-inch, 28-year-old, 135-pound man, described by Sledge, would be an unusually small and short man—a midget in size and height—significantly different from the defendant's normal height and weight.

Sledge testified that he did not remember if he initially described to the officers the robber's complexion as dark. The trial evidence established however that the defendant was dark complexioned.

There was a substantial variance between the descriptions of each of the physical characteristics of the robber which Sledge gave to the police officers and the actual descriptions of such physical characteristics of the defendant, *i.e.*, height, weight, age and complexion, which, evidentially, were the only physical characteristics of the robber that Sledge described. In fact, the sole features of the defendant that matched the victim's description of the robber were that the defendant was a black male.

In reversing the defendant's conviction for a sale of narcotics to an undercover police officer because the identity of the defendant was not proved beyond a reasonable doubt, the court pointed out in *People v. Barney* (1965), 60 Ill. App. 3d 79, 81, 208 N.E.2d 378, that the differences between the officer's description of the offender who sold him the drugs and the description of the defendant were "an increase of nine years in age, of five inches in height, of fifty pounds in weight and a change in posture from stooping to erect." The variances in the case at bar are practically identical.

After a bench trial the defendant was found guilty of rape and armed violence in *People v. Byas* (1983), 117 Ill. App. 3d 979, 985-86, 453 N.E.2d 1141. In reversing, the court stated:

> "[T]he complainant's description of her assailant substantially differs from the actual physical characteristics of the defendant. The complainant initially described her assailant as being six feet tall, 170 pounds and in his early twenties. The next day, during a police interview, the complainant revised her description of the attacker, stating that he was 5 feet 11 inches tall, weighed approximately 175 pounds, was approximately 23 years old, darkly complected and had a hairy chest. In fact, the defendant is 5 feet 7 inches tall, weighs 147 pounds and has no hair on his chest or stomach. The State calls these discrepancies 'minor.' These are not trivial variances, and the

State's evidence offers no explanation for these differences. *People v. Marshall* (1966), 74 Ill. App. 2d 483, 221 N.E.2d 133. See also *People v. Carroll* (1970), 119 Ill. App. 2d 314, 256 N.E.2d 153 (substantial variance in height, weight and presence of beard); *People v. Barney* (1965), 60 Ill. App. 2d 79, 208 N.E.2d 378 (variances in height, weight and posture)."

Sledge testified that he did not notice anything unusual about the robber's lips. He testified:

"Q. Now, nothing unusual about his [the robber's] lips, is that correct? You didn't tell anything about his lips?

A. Not that I could see, I wasn't paying any attention to his lips."

The uncontradicted trial testimony of the defendant's father established however, that the defendant had unusually thick lips. Rotation Slim, the defendant's father testified:

"Q. [I]s there anything on his [the defendant's] face that stands out?

A. Nothing but his mouth like mine. We got thick lips."

The defendant's lips were so noticeably large that his attorney stated in closing argument to the court, without contradiction or rebuttal argument from the prosecuting attorney, that "the most important thing, judge, you can take judicial notice that my client has large lips. There was no mention of it in his [Sledge's] initial description." Sledge did not observe this unique characteristic of his assailant. Although we do not have the benefit of the lineup photo, People's exhibit No. 1, in the record on appeal, which would reveal the extent, if any, to which the defendant's thick lips were unusual, nevertheless, we note that the prosecuting attorney made no effort to dispute that the defendant had unusually thick lips.

In *People v. Marshall* (1966), 74 Ill. App. 2d 483, 221 N.E.2d 133, the court found the defendant guilty of robbery. Immediately after the robbery, the victim reported to the police that the robber was the same height as the victim, 5 feet 11 inches. The defendant on trial for the robbery however was five inches shorter than the victim. The trial the victim testified that he was not sure if he initially told the police that the robber had a mustache, because he "didn't look that close." The victim's testimony in *Marshall* that he "didn't look that close" at the robber's mustache, is synonymous to Sledge's testimony in the case at bar that he "wasn't paying any attention to his [the robber's] lips." The following language of the court, regarding the mustache, in reversing the conviction in *Mar-*

*shall* because the victim's identification of the defendant as the robber was doubtful, vague and uncertain and was not proof of the defendant's guilt beyond a reasonable doubt, is applicable to the defendant's unusually thick lips in the case at bar.

"The fact that the defendant did not have a mustache at the time of the trial is not important; but the fact that the witness was not sure whether he had one at the time of the robbery is very important. *** In the case at bar, the witness' uncertainty is evidence that he did not carefully observe the robber's face. He admitted as much by his explanation for not knowing whether the robber had a mustache: 'I didn't look that close.'

The discrepancy between the defendant's height and the complaining witness' estimate casts doubt on the identification, and the witness' inability to observe whether the defendant wore a mustache discredits his identification." 74 Ill. App. 2d 483, 485, 221 N.E.2d 133.

Sledge testified that he saw the robber open his mouth to speak to him but that he did not observe anything unusual about the robber's teeth. Sledge testified:

"Q. But you saw him [the robber] open his mouth and talk to you, right?

A. Right.

Q. You could see his teeth, too. You saw his face when he was talking?

A. I wasn't looking for his teeth. I was looking for mercy.

Q. When you talked to him, did you see anything unusual on his teeth or in his mouth?

A. It wasn't but two words said—a few words said. He asked for my money, my weapon, the keys to my car. I wasn't looking at his teeth.

\* \* \*

Q. Did he open his mouth when he talked to you?

A. Yes, he did.

Q. Now, did you see anything unusual in his teeth?

\* \* \*

A. I don't remember seeing his teeth. I don't even know if he had teeth or not.

Q. Nothing unusual about his teeth?

A. No."

The uncontradicted testimony of the defendant's father and the other defense witness, Gloria Thacker, established that before the

robbery was committed, on the date that the robbery was committed, August 3, 1985, and thereafter, the defendant wore braces on his teeth because of a broken jaw. Their testimony was corroborated by the defendant's hospital records, admitted into evidence.

The uncontradicted evidence established that the defendant broke his jaw on March 6, 1985, while playing basketball in Michigan City, Indiana, where the defendant lived occasionally with his sister, that because of his broken jaw the defendant wore large silver braces on his teeth from March 6, 1985, until August 8, 1985, which was five days after the August 3, 1985, robbery, when the doctor removed the braces and that the braces were clearly visible when the defendant talked.

The defendant's hospital records from the Memorial Hospital of Michigan City, Michigan City, Indiana, admitted into evidence by stipulation, stated as follows:

"Admitted: 3/7/85                    Discharged: 3/9/85
This is a 20 year old black male who was playing ball yesterday before admission and the ball hit his face on the left side. He came to the Emergency room and x-ray showed fracture of the mandible. The patient was admitted:

Past history: Unremarkable.

Physician exam: Some tenderness of the left side of the mandible. Minimal occlusion. ENT is unremarkable. Chest, heart, lungs, abdomen, extremities are all unremarkable.

Laboratory date: SMA 18 shows elevated CPR which is probably because of the trauma and damage to the muscles of the masticator. Chest x-ray is unremarkable. *X-ray of the mandible shows there is a fracture of the mandible at the left side.*

CBC is normal.

Hospital course: Patient was admitted to the hospital and IV was started. Ampicilin 1 gram q60 was give IV piggyback. *On March 9 patient underwent closed reduction of mandibular fracture with intermaxilary fixation.* A few hours after surgery patient was doing well, tolerating PO diet. IV was discontinued. Patient expressed the feeling that he wants to be discharged and for that reason the patient was discharged and an appt. was given for next Tuesday to see me at the office, Ampicilin 500 mgs g6h was given and Tylenol with Codeine elixir for pain. Patient was told to irrigate the mouth and use the water pik to clean the teeth, keep the rubber bands affixed and keep the jaws immobilized.

FINAL DIAGNOSIS: Fracture of mandible.
Physician's Signature
M.K. Arab, M.D.
Slim, Willie L." (Emphasis added.)

The defendant's hospital records from St. Anthony Hospital, Michigan City, Indiana, of the removal of the defendant's silver teeth braces on August 8, 1985, state: "[T]he patient's name and address—Willie L. Slim, 2820 W. Kilbourne, Apt. 306, Milwaukee, Wisconsin 53208; admission date and time—August 8, 1985, 13:13 [hour]; Service—Sunday; home phone—414-344-2752; Sex—M; Race—B; Social Security No.—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; Rel—Pt; Guarantor name, address and phone No.—Willie L. Slim, 2820 W. Kilbourne, Apt. 306, Milwaukee, Wisconsin 53208, 414-344-2752; admitting physician—Mohammad K. Arab; account No.—055417-01-8; Diagnosis- of mandible; treatment/surgical procedures—S/P [Status Post] *closed reduction of mandibular fracture, removal of arch bars.*" (Emphasis added.) The record was signed by the patient, Willie Slim, and his physician, Dr. Arab.

Another St. Anthony Hospital record signed by the patient Willie Slim and dated August 8, 1985, states as follows:

"ST. ANTHONY HOSPITAL
INSTRUCTIONS FOR THE PATIENT
FOLLOWING OUTPATIENT SURGERY

Do NOT drive your car or ANY motor vehicle for at least 24 hours. You may experience some residual effects from the anesthetic, and thus your judgment and coordination may be impaired. Someone MUST drive you home.

Since you may experience some nausea, you will feel better if you remain quiet for the remainder of the day.

Begin your food intake gradually. Begin with sips of liquids, followed with some solid foods. If you do not feel like solids, take only liquids. While it is essential that you take liquids following anesthesia, you must NOT drink ANY alcoholic beverages for at least 24 hours.

You may experience some discomfort following surgery. The nurse will supply you with instructions for home care and, if needed, a prescription for pain medication.

Should any complications occur that you feel are related to your surgery, contact your surgeon immediately. If your surgeon is not available, contact St. Anthony Hospital's outpatient surgery unit at 874-0831, or the emergency department at 874-0614.

**Further Patient Instructions:**
DIET: Regular

MEDICATIONS: None - Tylenol

LEVEL OF ACTIVITY: Advance as tolerated

FOLLOW-UP: Tuesday

| X Willie Slim | D. Fish RN |
|---|---|
| Signature of Patient/Guardian | Signature of Witness |
| | 8-8-85 |
| | Date"

The final St. Anthony Hospital record was a letter dated November 27, 1985, to Willie L. Slim, 2820 W. Kilbourne, Apt. 306, Milwaukee, Wis. 53208, from Delores Evans of the hospital credit department requesting the defendant to pay his $258.21 bill due to St. Anthony Hospital.

The prosecuting attorney made no attempt to refute the evidence of the defendant's thick lips, broken jaw, and braces on his teeth or the hospital records, and the victim did not mention any one of these unique physical features when he described the robber to the police. In *People v. Byas* (1983), 117 Ill. App. 3d 979, 986, 453 N.E.2d 1141, the court stated that a witness' "failure to assert a distinctive physical feature which the defendant possesses is *prima facie* inconsistent conduct which, unexplained, tends to discredit the witness."

The defendant's father testified to an alibi defense for the defendant—that on the night of August 3, 1985, the defendant was with his father and his two brothers at home, third-floor, apartment 306, 2820 West Kilbourne, in Milwaukee, Wisconsin, where they all lived.

The defendant had no prior record and his arrest in the instant case on August 13, 1985, was the defendant's first and only arrest. The following language of the supreme court in reversing the defendant's armed robbery, home invasion and unlawful restraint convictions in *People v. Ash* (1984), 102 Ill. 2d 485, 492, 468 N.E.2d 1153, is applicable to the case at bar. The court stated: "[I]t is *our duty*, where a verdict of guilty is returned by a jury *** not only to carefully consider

the evidence *but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt* and is not sufficient to create an abiding conviction that he is guilty of the crime charged." *"A conviction cannot be deemed to be sustained beyond reasonable doubt by the evidence if identification of the accused was vague and doubtful."* (Emphasis added.) 102 Ill. 2d 485, 492-93, 494, 468 N.E.2d 1153.

In *People v. Gardner* (1966), 35 Ill. 2d 564, 221 N.E.2d 232, the only issue before the supreme court was whether the defendant's identification had been proved beyond a reasonable doubt. In holding that it had not been so proven and in reversing, the supreme court stated:

> "This court has often held that: 'In a criminal case it is incumbent upon the prosecution to prove beyond a reasonable doubt not only the commission of the crime charged but also its perpetration by the accused. *** And, while the identification and whereabouts of the defendant at the time of the crime are questions for the jury, yet, where from the entire record there is a reasonable doubt as to the guilt of the accused, a judgment of conviction will not be permitted to stand. [Citations.] Where the conviction of a defendant rests upon identification which is doubtful, vague and uncertain, and which does not produce an abiding conviction of guilt, it will be reversed. [Citations.] Neither can we disregard the evidence of alibi where the sole and only evidence contradicting it rests upon the identity of the defendant as the man who committed the crime." 35 Ill. 2d 564, 571, 221 N.E.2d 232.

In the case at bar the victim's identification of the defendant was doubtful, vague and uncertain and does not produce an abiding conviction of the defendant's guilt because of the discrepancies between the victim's descriptions of the robber's height, weight, age and complexion and the defendant's height, weight, age and complexion, and because of the undisputed evidence of the defendant's unique features of unusually thick lips and visible teeth braces on the date that the robbery was committed, corroborated by hospital records and which the victim did not observe or mention, and because of the defendant's unimpeached alibi. The defendant's identification as the robber was not proved beyond a reasonable doubt. We therefore reverse his conviction.

Reversed.

WHITE and MANNING, JJ., concur.